# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Mimes*, 2011 IL App (1st) 082747

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARTELL MIMES, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1–08–2747 |
| Filed | June 20, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for various offenses arising from an incident that started with the robbery of a drug dealer by defendant and three others, the appellate court held that the trial judge did not improperly assume the prosecutor's role by considering other-crimes evidence for the purpose of identification, that defendant had proper notice of the facts that increased the penalty range of his attempted murder conviction, that the 45-year sentence imposed for that offense was not an abuse of discretion, that his convictions for attempted murder and one count of aggravated unlawful use of a weapon did not violate the one-act, one-crime rule, but that his convictions for aggravated battery with a firearm and a second count of aggravated unlawful use of a weapon did violate the rule, that the right to bear arms was not violated by the provisions of the aggravated unlawful use of a weapon statute prohibiting a person from carrying an uncased, loaded and accessible handgun on a public city street, and that the $50 court system fee was properly imposed, but that certain other fees or fines were vacated or offset by defendant's presentence incarceration. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05–CR–28199; the Hon. Kenneth J. Wadas, Judge, presiding. |
| --- | --- |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, Aliza R. Kaliski, and Todd T. McHenry, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Miles J. Keleher, and Robin Murphy, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion. Presiding Justice Hall and Justice Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a bench trial, defendant Martell Mimes was convicted of attempted first degree murder, aggravated battery with a firearm, and two counts of aggravated unlawful use of a weapon (AUUW). He was sentenced to concurrent terms of 45 years in prison for attempted murder, 10 years for aggravated battery with a firearm, and 3 years for AUUW.

¶ 2 On appeal, he contends: (1) the trial judge improperly assumed the role of prosecutor; (2) the trial court improperly increased defendant's sentence for attempted murder where the State did not charge the sentence enhancing facts in the indictment; (3) defendant's sentence for attempted murder was excessive; (4) his convictions for aggravated battery with a firearm and two counts of AUUW violated the one-act, one-crime rule; (5) his convictions under the AUUW statute should be vacated because the criminalization of carrying a firearm on one's person in public violates the constitutional guarantees of the right to bear arms; and (6) the trial court erroneously imposed various fines, fees and costs against him.

¶ 3 For the reasons that follow, we hold that (1) the trial judge did not improperly assume the role of prosecutor by considering other-crimes evidence against defendant for the limited purpose of identification; (2) defendant received sufficient notice prior to trial of alleged facts that increased the penalty range of his attempted murder conviction where he was not prejudiced in the preparation of his defense; (3) the trial court's 45-year sentence for

attempted first degree murder was not an abuse of discretion; (4) defendant's convictions for attempted first degree murder and one count of AUUW did not violate the one-act, one-crime rule, but this rule was violated by his convictions for aggravated battery with a firearm and a second count of AUUW; (5) defendant's conviction for carrying an uncased, loaded and accessible handgun on a public city street is affirmed because the relevant provisions of Illinois's AUUW statute did not violate the constitutional protection of the right to bear arms; and (6) the trial court properly assessed defendant with the $50 court system fee, but the other challenged fees or fines are vacated or offset by his time spent in custody.

¶ 4                                    I. BACKGROUND

¶ 5        Defendant was arrested and charged with the November 8, 2005 attempted first degree murder and aggravated battery with a firearm of the 17-year-old victim, Lenard Richardson. Defendant was also charged with eight counts of AUUW based on allegations that he was carrying an uncased, loaded and accessible firearm in public and did not have a Firearm Owner's Identification (FOID) card, was under 21 years of age, and was involved in street gang activity.

¶ 6        At the bench trial in August 2008, the testimony of Richardson and his older brother, Leonard Cole, established that Richardson was selling heroin in a Chicago public housing building on the evening in question when he was robbed by defendant and three other offenders. Defendant brandished a silver pistol, took Richardson's bundle of narcotics and about $200, and hit Richardson in his jaw with the pistol. Richardson then telephoned Cole, who drove to the scene with another friend. When Cole arrived at the scene, he told Richardson to wait in the car and he (Cole) would "handle it." Cole and his friend walked across the street to a second public housing building and spoke with Lavane Tanksley. After a minute, Richardson lost sight of Cole, got out of the car, and went inside the second building.

¶ 7        Richardson went upstairs, looked out a window and saw Cole talking to Tanksley. Richardson then went downstairs to the lobby. As he was by the door and about to exit the building, he saw defendant, who was outside and about three feet away. Defendant walked toward Richardson and was carrying a silver pistol. Defendant started shooting as he walked up the steps to enter the building, and continued shooting as he walked into the lobby, passed Richardson and ran up a staircase. When Richardson heard the initial gunshots, he dropped to the ground and heard more gunshots fired. Only Richardson and defendant were in the lobby. Richardson did not have a gun. Richardson sustained two gunshot wounds fired into his back. Cole also heard the gunshots, dropped to the ground and then saw that someone was lying inside the lobby with his feet sticking out the door. Cole went into the lobby and saw that the victim was Richardson. No one else was in the lobby. Cole remained with Richardson until the police arrived.

¶ 8        Richardson was taken to the hospital and briefly interviewed by the police. Although Richardson initially denied selling drugs at the scene, he subsequently told the police about the events leading up to the shooting, gave a description of the shooter, and said he thought the shooter used a gun that belonged to Tanksley. The police spoke with Tanksley and

obtained defendant's name. One day after the shooting, Richardson identified defendant as the shooter from a photo array. As a result of the shooting, Richardson suffered a spinal cord injury and was paralyzed from the waist down. Thereafter, he was confined to a wheelchair and had to wear a colostomy bag and diaper. Furthermore, both his legs were subsequently amputated.

¶ 9 The State's evidence established that police recovered at the scene three shell casings and a full cartridge outside the building on the steps leading up to the lobby door. Inside the lobby, the police recovered five more shell casings and several pieces of metal from expended bullets. All eight shell casings were fired from the same gun.

¶ 10 Later, defendant was arrested and advised of his *Miranda* rights. According to the testimony of Chicago police detective Chris Matias, defendant initially told the police that he was inside his sister's apartment the entire day when the offense occurred. Later, however, defendant told the police that he used Tanksley's gun to shoot Richardson because he thought Richardson was reaching for a handgun. After the shooting, defendant ran upstairs to his sister's apartment. Furthermore, defendant told the police that he never saw a gun in Richardson's hands. Defendant did not testify at the bench trial.

¶ 11 After closing arguments, the trial judge stated that he considered the other-crimes evidence, *i.e.*, the testimony that defendant robbed Richardson at gunpoint and struck him with the gun, only for the purpose of identification. The trial court concluded that any prejudicial effect was outweighed by the probative value of that evidence, which was relevant to show Richardson's prior opportunity to observe defendant and then identify him later as the shooter. The trial court stated that Richardson was a credible witness and the physical evidence corroborated his version of the events. The trial court also stated that Detective Matias's testimony concerning defendant's inculpatory admissions to the shooting was credible.

¶ 12 The trial court found defendant guilty of attempted first degree murder, aggravated battery with a firearm, and two counts of AUUW. Specifically, defendant's AUUW convictions were based on findings that he (1) knowingly carried on his person an uncased, loaded and accessible firearm while not on his own land or in his own abode or fixed place of business (720 ILCS 5/24–1.6(a)(1), (a)(3)(A) (West 2004)), and (2) possessed an uncased, loaded and accessible firearm upon public land (720 ILCS 5/24–1.6(a)(2), (a)(3)(A) (West 2004)). The trial court found defendant not guilty on six other counts of AUUW because the State failed to prove he was involved in gang-related activity, did not have a FOID card or was under 21 years of age.

¶ 13 At the sentencing hearing, the parties stipulated that two Chicago police officers would testify that they arrested defendant in September 2005 in the hallway of a building where he did not live for being in possession of 23 small clear plastic bags containing crack cocaine. Moreover, the State presented Richardson's victim impact statement and informed the court that defendant was out on bond for the 2005 possession of a controlled substance case when he shot and severely injured Richardson. Furthermore, defendant had a prior juvenile adjudication of guilt for burglary but no prior adult convictions.

¶ 14 For the offense of attempted first degree murder, the trial court imposed a 20-year

sentence plus the minimum mandatory addition of 25 years for a cumulative 45-year sentence based on the finding that defendant was the shooter in the case and caused great bodily harm to the victim. Defendant also received concurrent sentences of 10 years for aggravated battery with a firearm, and three years each for two counts of AUUW. The trial court also assessed $840 for various costs, fees and fines. Defendant timely appealed.

¶ 15                                    II. ANALYSIS

¶ 16    On appeal, defendant contends: (1) the trial court improperly assumed the role of prosecutor when it *sua sponte* considered other-crimes evidence; (2) the trial court improperly added 25 years to his 20-year attempted murder sentence where the State did not charge the sentence enhancing facts in the indictment; (3) defendant's 45-year sentence for attempted murder was excessive; (4) pursuant to the one-act, one-crime rule, his convictions for aggravated battery with a firearm and two counts of AUUW should be vacated because they were based on the same physical act as his attempted murder conviction; (5) his convictions under the AUUW statute should be vacated because the criminalization of openly carrying a firearm on one's person in public violates the constitutional guarantees of the right to bear arms; and (6) the trial court erroneously imposed various fines, fees and costs against him.

¶ 17                            A. Appearance of Partiality

¶ 18    Defendant argues the trial court erred when, after closing argument, it stated, *sua sponte*, that certain testimony, *i.e.*, that defendant robbed Richardson at gunpoint and hit him in the jaw with the gun, was relevant only to show Richardson's ability to identify defendant as the offender who shot him later the same day. The trial court also stated that the probative value of this other-crimes evidence outweighed any prejudicial effect. Defendant acknowledges that all the testimony concerning the armed robbery was admitted during the bench trial without any objection from defendant. Nevertheless, defendant contends that the trial court's statements established that it impermissibly acted as a prosecutor because the State never raised the issue of the admissibility of the other-crimes evidence. We find that defendant's argument lacks merit.

¶ 19    A trial judge abuses his discretion when he abandons his judicial role and adopts the role of prosecutor. *People v. Hicks*, 183 Ill. App. 3d 636, 646 (1989). However, where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued, a judge has a duty to interpose and avoid the miscarriage of justice either by suggestions to counsel or an examination conducted by the judge himself. *People v. Franceschini*, 20 Ill. 2d 126, 132 (1960).

¶ 20    Here, the trial judge did not improperly act as a prosecutor when he merely clarified, prior to announcing his findings, that he had considered the properly admitted testimony about the robbery, which constituted other-crimes evidence, only for the relevant purpose of identification. Specifically, defendant's prior bad act afforded Richardson the opportunity to observe defendant and the gun up close and thereby assisted Richardson in identifying defendant as the offender who shot him later that day.

¶ 21    This situation is dissimilar to that in *Village of Kildeer v. Munyer*, 384 Ill. App. 3d 251 (2008), relied upon by defendant, where defendant Munyer was charged with reckless driving in three separate cases. Although the three cases involved different witnesses from three separate incidents that occurred on different dates, the trial court heard the three cases together. *Id.* at 252. In the first and second cases, the witnesses testified that the defendant drove his vehicle toward the witnesses' vehicles and then swerved into the witnesses' path, causing the witnesses to leave the road to avoid being hit. *Id.* at 252-53. In the third case, the defendant drove toward two stopped cars, causing the occupants to think the defendant would strike them before he pulled his vehicle away at the last minute. *Id.* at 253. After the prosecution had rested, the trial court granted the defendant a directed finding in the first and second cases based on the failure of the complaints to give sufficient factual descriptions of the alleged acts. *Id.* at 253. Then, the trial court improperly acted as a prosecutor when it *sua sponte* took the affirmative step of admitting the testimony from the two dismissed reckless driving cases as other-crimes evidence in the remaining reckless driving case in order to establish proof of the defendant's willful or wanton mental state. *Id.* at 253, 257.

¶ 22    In this case, the trial judge did not prompt the State to present the other-crimes evidence, and the State did not reopen its case to present additional evidence. Instead, the judge merely commented on the relevant basis for the previously admitted other-crimes evidence. Furthermore, the defense never argued that the testimony concerning the robbery constituted inadmissible other-crimes evidence. Defendant cannot credibly complain on appeal that he was prejudiced by the admission of that evidence where the defense referred to that testimony extensively during the cross-examinations of Richardson and Cole in order to discredit them as drug peddlers. Defendant fails to establish any appearance of partiality or abuse of discretion by the trial judge here.

¶ 23            B. Mandatory Addition to Defendant's Attempted Murder Sentence

¶ 24    Defendant contends that the addition of 25 years to his 20-year sentence for attempted first degree murder is void because the State violated section 111–3(c–5) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/111–3(c–5) (West 2004)). According to defendant, section 111–3(c–5) required the State to give him written notice prior to trial that it would seek an enhanced sentence based on the facts that he personally discharged a firearm which caused great bodily harm to Richardson. Defendant acknowledges that he failed to raise this issue both prior to sentencing and in his motion to reconsider the sentence. He argues, however, that a void order may be challenged at any time and a "sentence which does not conform to a statutory requirement is void." *People v. Arna*, 168 Ill. 2d 107, 113 (1995).

¶ 25    Alternatively, defendant seeks review of this issue under the plain error rule, arguing that the imposition of an unauthorized sentence affected substantial rights where the State's alleged indictment error prevented him from exercising his right to request a bifurcated proceeding. Specifically, defendant contends that if he had known the State would seek an enhanced sentence based on his use of a firearm and causing the victim great bodily harm, then defendant could have requested a bifurcated proceeding where a jury would decide his guilt but a judge would decide whether the enhancing factor existed. Furthermore, defendant

could then have chosen to testify either at the guilt phase of the trial only, or the enhancing factor phase only, or neither or both. See Ill. S. Ct. R. 451(g) (eff. July 1, 2006) (when the State seeks an enhanced sentence, trial courts have discretion under section 111–3(c–5) in deciding whether to conduct unitary or bifurcated trials on the issue of guilt and on the issue of whether a sentencing enhancement factor exists).

¶ 26    Because this issue involves a question of law, our review is *de novo. People v. Rowell*, 229 Ill. 2d 82, 92 (2008). A defendant has a fundamental right to be informed of the nature and cause of criminal accusations made against him. *Id.* at 92-93. The legislature enacted section 111–3(c–5) of the Code in response to the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that whenever a fact other than a prior conviction is considered to enhance a penalty beyond the statutory maximum, that fact must be found to exist beyond a reasonable doubt by the trier of fact. *People v. Crutchfield*, 353 Ill. App. 3d 1014, 1023 (2004).

¶ 27    Section 111–3(c–5) provides:

> "Notwithstanding any other provision of law, *** if an alleged fact (other than the fact of a prior conviction ) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt. Failure to prove the fact beyond a reasonable doubt is not a bar to a conviction for commission of the offense, but is a bar to increasing, based on that fact, the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for that offense." 725 ILCS 5/111–3(c–5) (West 2004).

Defendant's challenge on appeal is limited to the issue of notice; he does not assert that the alleged facts that he fired the gun that caused Richardson great bodily harm were neither submitted to the fact finder nor proven beyond a reasonable doubt.

¶ 28    Attempted first degree murder is a Class X felony (720 ILCS 5/8–4(c)(1) (West 2004)) and is usually subject to a sentencing range of 6 to 30 years' imprisonment (720 ILCS 5/8–4(c)(2) (West 2004); 730 ILCS 5/5–8–1(a)(3) (West 2004)). However, if the offense involved certain factors, a mandatory number of years must be added to the term of imprisonment imposed by the court. For example, if the defendant personally discharged a firearm, then 20 years must be added to the term of imprisonment imposed by the court. 720 ILCS 5/8–4(c)(1)(C) (West 2004). If the defendant personally discharged a firearm that proximately caused, *inter alia*, great bodily harm to another person, then 25 years or up to a term of natural life must be added to the term of imprisonment imposed by the court. 720 ILCS 5/8–4(c)(1)(D) (West 2004).

¶ 29    Although the term *great bodily harm* is not susceptible of a precise legal definition, it requires an injury of a greater and more serious character than an ordinary battery. *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991). Bodily harm as it relates to ordinary battery requires "some sort of physical pain or damage to the body, like lacerations, bruises or

abrasions, whether temporary or permanent." *People v. Mays*, 91 Ill. 2d 251, 256 (1982). Great bodily harm is not dependent upon hospitalization of the victim, nor the permanency of his disability or disfigurement, but, rather, centers upon the injuries the victim did, in fact, receive. *Figures*, 216 Ill. App. 3d at 401.

¶ 30    Here, the indictment alleged that defendant

> "committed the offense of attempt first degree murder in that he, without lawful justification, with intent to kill, did any act, to wit: shot Lenard Richardson about the body with a firearm, which constituted a substantial step towards the commission of the offense of first degree murder, in violation of Chapter 720, Act 5, Section 8–4(a) (720–5\9–1(a)(1)), of the Illinois Compiled Statutes."

¶ 31    We find that the plain language of the indictment clearly set forth the alleged fact that defendant personally discharged the firearm. In addition, the indictment cited both the attempt and first degree murder statutes. Consequently, defendant could look to subsection (c)(1)(C) of the cited attempt statute to know that he was subject to a mandatory 20-year addition to his sentence based upon a finding that he personally discharged the gun.

¶ 32    We agree with defendant, however, that the indictment failed to include the alleged fact that defendant's shooting proximately caused Richardson great bodily harm. Although the indictment sufficiently alleged that defendant wounded Richardson, a gunshot wound does not necessarily satisfy the great bodily harm requirement. See *People v. Ruiz*, 312 Ill. App. 3d 49, 62-63 (2000) (gunshot wound to the police officer's knee was not a severe bodily injury where the wound was barely visible on the day of the incident and the officer did not immediately seek medical treatment); *People v. Durham*, 303 Ill. App. 3d 763, 770 (1999) (battery victim's gunshot injury, which required no medical attention and was described as a mark, small nick or a cut, was not a severe bodily injury for sentencing purposes).

¶ 33    The timing of a challenge to the sufficiency of an indictment is significant because it determines which standard must be applied in reviewing the sufficiency of the indictment on appeal. *People v. Davis*, 217 Ill. 2d 472, 478 (2005); *People v. Cuadrado*, 214 Ill. 2d 79, 86-87 (2005). An indictment challenged before trial must strictly comply with the pleading requirements of section 111–3. *People v. Nash*, 173 Ill. 2d 423, 429 (1996). In contrast, when an indictment is attacked for the first time posttrial, a defendant must show that he was prejudiced in the preparation of his defense. *Davis*, 217 Ill. 2d at 479. "[W]hen the sufficiency of an indictment *** is attacked for the first time on appeal, the indictment *** is sufficient if it apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and to allow him to plead a resulting conviction as a bar to future prosecutions arising from the same conduct." *Rowell*, 229 Ill. 2d at 93. Because defendant challenged the indictment for the first time on appeal, the State's failure to strictly comply with section 111–3(c–5) is not dispositive. Instead, the dispositive issue is whether defendant was prejudiced in the preparation of his defense.

¶ 34    To show prejudice, defendant argues that he might have requested a bifurcated hearing under Supreme Court Rule 451(g) if he had received written notice prior to trial that the State intended to show he caused great bodily harm to the victim. Even assuming, *arguendo*, that the trial court would have granted a request for a bifurcated proceeding under the

circumstances present here, the record refutes defendant's claim that he was prejudiced in the preparation of his defense. Specifically, the record establishes that defendant was apprised of the serious nature of Richardson's injuries long before defendant submitted his August 18, 2008 written waiver of his right to a jury trial. The November 19, 2005 arrest report stated that defendant was "identified as the individual who shot and seriously wounded victim (Richardson, Lenard) with a handgun." Furthermore, at defendant's March 9, 2006 bond hearing, the State asked the court to maintain the "no bond hold" where defendant was out on bond for a case involving drug possession and then "commits this crime, where he ends up shooting the victim in the back on this attempt murder case."

¶ 35       In addition, at the September 19, 2006 hearing on defendant's motion to reduce bail, the State, in the presence of defendant, informed the court of his criminal history and said that the

> "facts of this case are such that he was identified as having shot at the victim on November 8, 2005 at approximately 7:00 o'clock in the evening in the Ickes Homes at 2400 South State Street. The victim was shot twice in the back, shot at more than half a dozen times. The victim was left paralyzed."

Defense counsel responded, in part, that "in regards to the facts of the case it does appear that the victim, although a set of tragic circumstances have resulted in him being paralyzed in regards to the matter."

¶ 36       The record establishes that defendant cannot credibly argue that he was not informed prior to trial of the facts concerning the great bodily harm Richardson sustained as a result of the shooting. At the very least, defendant knew that Richardson was paralyzed as a result of the two gunshots defendant fired into Richardson's back. Moreover, the indictment apprised defendant of the offense charged–attempted first degree murder–and cited both the attempt and first degree murder statutes. Consequently, defendant was able to look to subsection (c)(1)(D) of the cited attempt statute to find the missing sentence enhancing factor. *Cf. Rowell*, 229 Ill. 2d at 95-96 (where the State aggregated the defendant's small retail thefts but failed to allege the necessary element of a single intent or design, and the charging instrument cited the retail theft statute but did not reference the statute concerning the joinder of offenses, then the defendant suffered prejudice because he could not look to the cited statute to find the missing element). Specifically, subsection (c)(1)(D) informed defendant that he could receive an enhanced sentence of 25 years or up to natural life for personally discharging the firearm that caused Richardson great bodily harm.

¶ 37       We find that defendant cannot establish that the omission of the words "proximately caused great bodily harm" in the indictment prejudiced his preparation of his defense. Accordingly, his enhanced sentence is not subject to reversal or reduction because the indictment in this case apprised him of the proper elements of the offense with sufficient specificity to allow him to prepare his defense. Consequently, defendant's sentence is not void where he received sufficient pretrial notice of the attempted murder offense charged and his sentence conformed to the statutory requirement of 111–3(c–5) because the State proved beyond a reasonable doubt that defendant fired the gun that caused Richardson great bodily harm.

¶ 38    Finally, the plain language of section 111–3(c–5) refutes defendant's claim that he was entitled to specific, written, pretrial notice that the State would seek an enhanced sentence. Section 111–3(c–5) clearly states that the defendant is entitled to written pretrial notice of the *alleged fact* that would be used to increase his sentence. There is no requirement that the defendant must also be given written pretrial notice about the potential increased sentence he could receive.

¶ 39                        C. Sentence and Abuse of Discretion

¶ 40    Defendant complains that his 45-year sentence for attempted murder is excessive. Specifically, he argues that the trial court failed to properly account for his rehabilitative potential where he was 19 years old at the time of the offense in 2005, had little criminal history, maintained employment until 2004 when his employer became ill, had a supportive family and hoped to continue his education.

¶ 41    The trial court has broad discretionary powers in choosing the appropriate sentence. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). A judgment as to the proper sentence must be based on the circumstances of each case and depends on many factors, including the seriousness of the offense; the need to protect the public and provide for deterrence and retribution; and the defendant's demeanor, general moral character, mental capacity, age, background, prior criminal history, rehabilitative potential and future dangerousness. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000); *People v. Thompson*, 222 Ill. 2d 1, 35 (2006); *People v. Hunzicker*, 308 Ill. App. 3d 961, 966 (1999). A reviewing court gives great deference to a trial court's sentencing decision and cannot substitute its judgment for that of the trial court simply because it would have weighed the factors differently. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010) (reversing the appellate court to reinstate the trial court's 24-year sentence for the 15-year-old defendant convicted of firing a gun at a fellow student in a crowded hallway while school was in session without injuring anyone).

¶ 42    Here, defendant received a 45-year sentence, which was based upon 20 years for attempted first degree murder (720 ILCS 5/8–4(c)(1) (West 2004); 730 ILCS 5/5–8–1(a)(3) (West 2004) (this Class X felony is subject to 6 to 30 years in prison)), plus the minimum mandatory consecutive addition of 25 years where he personally discharged a firearm that proximately caused great bodily harm to another person (720 ILCS 5/8–4(c)(1)(D) (West 2004)). His 45-year sentence is well within the statutory range of 31 to 55 years and up to natural life.

¶ 43    In addition, the trial court properly considered significant aggravating factors. Defendant approached the 17-year-old, unarmed victim and began firing multiple gunshots from a distance of only two or three feet away. Moreover, the victim's injuries were permanent and devastating. In addition, defendant, who was only 19 years old at the time of this offense, was out on bond for a charge of possession of a controlled substance (see *People v. Williams*, 262 Ill. App. 3d 734, 746 (1994)), and already had a juvenile adjudication of guilt for a burglary offense. Furthermore, defendant presents no evidence to indicate that the trial court failed to consider any mitigation factors, like defendant's age, family support or rehabilitative potential. See *People v. Morgan*, 306 Ill. App. 3d 616, 633 (1999); *People v. Garcia*, 296 Ill.

App. 3d 769, 781 (1998). Consequently, defendant has failed to establish that the trial court abused its discretion in sentencing defendant to 45 years' imprisonment for his attempted first degree murder offense.

¶ 44                                    D. One-Act, One-Crime Rule

¶ 45       The one-act, one-crime rule prohibits multiple convictions when (1) the convictions are carved from precisely the same physical act, or (2) one of the offenses is a lesser-included offense of the other. *People v. Lindsey*, 324 Ill. App. 3d 193, 200 (2001). The term "act" is defined as "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977). If the court determines that the defendant committed multiple acts, it must then determine whether any of the offenses are lesser-included offenses. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). If so, multiple convictions are improper; if not, multiple convictions may be entered. *Id*. We review *de novo* defendant's claim that his convictions violated the one-act, one-crime rule. *People v. Dryden*, 363 Ill. App. 3d 447, 453 (2006).

¶ 46       Defendant asserts, the State concedes, and we agree that defendant's conviction for aggravated battery with a firearm violates the one-act, one-crime rule because it was predicated on the same act as his attempted murder conviction. Because the two relevant counts of the indictment charged defendant with the same physical act, *i.e.*, shooting the victim with a firearm, the lesser felony, aggravated battery with a firearm, must be vacated. See *People v. Aquino*, 239 Ill. App. 3d 12, 19 (1992) (vacating the defendant's conviction for aggravated battery with a firearm where the defendant was also charged and convicted of attempted first degree murder based on the same physical act of shooting his wife). Therefore, we vacate his conviction for aggravated battery with a firearm and the corresponding 10-year concurrent sentence.

¶ 47       Further, defendant asserts, the State concedes, and we agree that defendant's two convictions for AUUW stem from the same physical act of carrying an uncased, loaded and accessible firearm in public and, thus, violate the one-act, one-crime rule. *People v. Quinones*, 362 Ill. App. 3d 385, 396-97 (2005). Therefore, we vacate one of his AUUW convictions and the corresponding three-year concurrent sentence.

¶ 48       We do not agree, however, with defendant's claim that his one remaining AUUW conviction also violates the one-act, one crime rule. According to defendant, his remaining AUUW conviction stemmed from precisely the same physical act required for his attempted murder conviction, *i.e.*, possession of a loaded firearm. Defendant acknowledges that he failed to raise this issue below and therefore failed to preserve it for review. Defendant, however, contends that this improper conviction affects substantial rights and asks this court for relief under the plain-error analysis.

¶ 49       We find, however, that no error occurred. Defendant's convictions for attempted murder and AUUW were not carved from precisely the same physical act. Although possession of the loaded gun was a common factor for both the attempted murder and AUUW charges, defendant's criminal conduct did not consist of a single act. In committing the offense of AUUW, defendant carried an uncased, loaded and accessible firearm on a public city street.

In committing the offense of attempted murder, defendant engaged in the separate and additional act of shooting Richardson about his body with the gun. The AUUW and attempted murder charges each were based on separate and additional acts not shared by the other charge.

¶ 50    Furthermore, AUUW was not a lesser-included offense of the charged attempted murder offense. In order to determine whether a matter involves a lesser-included offense, Illinois courts examine the charging instrument to see whether the description of the greater offense contains a broad foundation or main outline of the lesser offense. *People v. Kolton*, 219 Ill. 2d 353, 360-61 (2006). This decision involves a case-by-case determination using the factual description of the charged offense in the indictment. *Id.* at 367. "A lesser offense will be 'included' in the charged offense if the factual description of the charged offense describes, in a broad way, the conduct necessary for the commission of the lesser offense and any elements not explicitly set forth in the indictment can reasonably be inferred." *Id.*

¶ 51    We first review the statutory definition of AUUW and determine whether the facts alleged in count I of the indictment (charging attempted first degree murder) contain a broad foundation or main outline of the offense of AUUW. Section 24–1.6 of the Criminal Code of 1961 (Criminal Code), which defines the offense of AUUW, provides, in pertinent part, as follows:

> "(a) A person commits the offense of [AUUW] when he or she knowingly:
>
> (1) Carries on or about his or her person *** except when on his or her land or in his or her abode or fixed place of business any pistol, revolver *** or other firearm; or
>
> (2) Carries or possesses on or about his or her person, upon any *** public lands within the corporate limits of a city, village or incorporated town, *** except when on his or her own land or in his or her own abode or fixed place of business, any pistol, revolver *** or other firearm; and
>
> (3) One of the following factors is present:
>
> (A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense ***." 720 ILCS 5/24–1.6(a)(1), (a)(2), (a)(3)(A) (West 2004).

¶ 52    Count I of the indictment alleged that defendant committed the offense of attempted first degree murder in that he

> "without lawful justification, with intent to kill, did any act, to wit: shot Lenard Richardson about the body with a firearm, which constituted a substantial step towards the commission of the offense of first degree murder."

¶ 53    We find that count I does not set forth a broad definition or main outline of AUUW. In particular, count I does not allege that defendant carried the firearm either when he was not on his land or in his abode or fixed place of business, or when he was on a public city street. The indictment here clearly referred to different conduct for each offense. We conclude, therefore, that AUUW is not a lesser-included offense of defendant's attempted murder conviction.

¶ 54 Accordingly, we vacate defendant's aggravated battery with a firearm conviction and one conviction for AUUW. We affirm his remaining AUUW conviction.

¶ 55 E. Constitutionality of AUUW Statute

¶ 56 Defendant argues that his AUUW conviction should be vacated because the relevant provisions of the AUUW statute criminalize the open carrying of a loaded firearm on one's person on a public street and, thus, violate both state and federal constitutional guarantees of the right to bear arms. Whether a statute is constitutional is a question of law to be reviewed *de novo*. *People v. Morgan*, 203 Ill. 2d 470, 486 (2003). For the reasons that follow, we hold that the provisions of the AUUW statute at issue here do not violate the constitutional protections of the right to bear arms.

¶ 57 As discussed above, defendant is subject to only one AUUW conviction pursuant to the one-act, one-crime rule. Because defendant's constitutional challenge to the AUUW statute is not impacted by which offense is vacated, we will address his constitutional challenge based on his conviction that he knowingly carried or possessed on or about his person a firearm upon public land, to wit: South State Street, within the corporate limits of a city, to wit: the City of Chicago, at a time when he was not on his own land or in his own abode or fixed place of business and when he was not an invitee thereon for the purpose of the display of such weapon or the lawful commerce in weapons, and the firearm was uncased, loaded and immediately accessible at the time of the offense, in violation of sections 24–1.6(a)(2) and (a)(3)(A) of the Criminal Code (720 ILCS 5/24–1.6(a)(2), (a)(3)(A) (West 2004)).

¶ 58 The second amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The Illinois Constitution provides that "[s]ubject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. 1970, art I, § 22.

¶ 59 In *District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008), a majority of the Supreme Court held that a Washington, D.C., ordinance violated the second amendment because the ordinance totally banned handgun possession in the home and required that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable. The Court found that the original understanding of the second amendment was grounded in the belief that the right to bear arms ensured that a militia could easily be formed if needed and provided protection from tyranny. *Id*. at 599-601. The right was also popularly understood as an individual right to self-defense, particularly for the defense of one's hearth and home, that was unconnected to militia service. *Id*. at 586. The Court stated that the second amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (*Id*. at 635), and "handguns are the most popular weapon chosen by Americans for self-defense in the home" (*Id*. at 629).

¶ 60 Although the second amendment guaranteed the preexisting "individual right to possess and carry weapons in case of confrontation," the second amendment, like the first amendment's right of free speech, was not unlimited. *Id*. at 592, 595. The Court did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of

-13-

confrontation." (Emphasis in original.) *Id.* at 595.

¶ 61    In reaching its conclusion, the Court did not determine the specific level of scrutiny appropriate to the issue under review. Instead, the Court noted that "the inherent right of self-defense has been central to the Second Amendment right," and rejected the application of a rational basis review to conduct within the scope of the second amendment's protection. *Id.* at 628-29 n.27. The Court also rejected a judge-empowering, freestanding, interest-balancing inquiry for evaluating second amendment restrictions and, in particular, for the core protection of an enumerated constitutional right. *Id.* at 634-35. The Court concluded that a total ban on the possession of operable handguns in the home, "where the need for defense of self, family, and property is most acute," made it "impossible for citizens to use them for the core lawful purpose of self-defense." *Id.* at 628-30. Such a ban could not withstand any level of heightened scrutiny and, thus, was unconstitutional. *Id.* at 628-29 n.27.

¶ 62    The Court recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Moreover, the Court warned that its opinion should not be construed as casting doubt on longstanding and presumptively lawful regulatory measures, like prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places like schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. *Id.* at 626-27 n.26. In addition, the second amendment does not protect the carrying of dangerous or unusual weapons not typically possessed by law-abiding citizens for lawful purposes. *Id.* at 624-27. Beyond this, the Court did not analyze the scope of the second amendment's protection. *Id.* at 626.

¶ 63    Later, in *McDonald v. City of Chicago*, 561 U.S. __, __, 130 S. Ct. 3020, 3036 (2010),[1] the Court addressed whether the second amendment right to keep and bear arms was fundamental to our scheme of ordered liberty, *i.e.*, deeply rooted in our nation's history and tradition, and, thus, incorporated in the concept of due process. A plurality of the Court concluded that the right to keep and bear arms was considered fundamental where individual self-defense is a basic right, the central component of the second amendment right, and deeply rooted in our nation's history and tradition. *Id.*, 561 U.S. at __, 130 S. Ct. at 3036-42. The Court stated that concerns about public safety or federalism did not warrant any departure from established incorporation methodology. *Id.*, 561 U.S. at __, 130 S. Ct. at 3045-46. "[I]f a Bill of Rights guarantee is fundamental from an American perspective, then *** that guarantee is fully binding on the States and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values." (Emphasis in original.) *Id.*, 561 U.S. at __, 130 S. Ct. at 3046.

---

[1]The *McDonald* petitioners filed suit against two Illinois municipalities, seeking a declaration that ordinances which effectively banned handgun possession by almost all private citizens residing in the municipalities violated the second and fourteenth amendments. *Id.*, 561 U.S. at __, 130 S. Ct. at 3026-27. The district court rejected the petitioners' argument that the ordinances were unconstitutional, and the circuit court affirmed. *Id.*, 561 U.S. at __, 130 S. Ct. at 3027. The Supreme Court reversed the judgment and remanded the case. *Id.*, 561 U.S. at __, 130 S. Ct. at 3050.

¶ 64    The Court noted that the incorporation of the individual guarantees of the Bill of Rights under the fourteenth amendment did not mean that a "watered-down, subjective version" of those guarantees applied to the states. *Id.*, 561 U.S. at __, 130 S. Ct. at 3035. Rather, incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." (Internal quotation marks omitted.) *Id.*, 561 U.S. at __, 130 S. Ct. at 3035; see also, *Id.*, 561 U.S. at __ n.5, 130 S. Ct. at 3054 n.5 (Scalia, J., concurring) ("[T]he demise of watered-down incorporation [citation] means that we no longer subdivide Bill of Rights guarantees into their theoretical components, only some of which apply to the States. The First Amendment freedom of speech is incorporated–not the freedom to speak on Fridays, or to speak about philosophy."). The Court reiterated *Heller*'s holding "that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense," and then held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.*, 561 U.S. at __, 130 S. Ct. at 3050.

¶ 65    Defendant argues his AUUW conviction violates the second amendment of the United States Constitution and article I, section 22, of the Illinois Constitution because the relevant provisions of the AUUW statute impermissibly burden the fundamental right to keep or bear arms for self-defense. The State responds that *Heller* has no bearing on the challenged provisions of the AUUW statute at issue here because *Heller* addressed the limited issue of the constitutionality of a regulation that prohibited the possession of a loaded and operable firearm in one's home. According to the State, the reach of *Heller*'s holding does not extend to the statutory provisions at issue here, which prohibited carrying an uncased, loaded and accessible firearm in public on the street.

¶ 66    This court has used a two-part approach to second amendment claims. *Wilson v. Cook County*, 407 Ill. App. 3d 759, 768 (2011), *pet. for leave to appeal allowed*, No. 112026 (Ill. May 25, 2011) (discussing several federal court cases that used a similar approach for second amendment claims). First, the court considers whether the challenged law imposes a burden on conduct falling within the scope of the second amendment's guarantee. *Id.* at 766. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right to bear arms when the second amendment was ratified. *Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them ***."). If the challenged law does not burden protected conduct, then the law is valid, provided that it satisfies the due process mandate of rationality in lawmaking. *Wilson*, 407 Ill. App. 3d at 766; *Heller*, 554 U.S. at 629 n.27. However, if the challenged law burdens conduct that was within the scope of the right, then the court applies an appropriate form of heightened means-end scrutiny. *Wilson*, 407 Ill. App. 3d at 766. Because a rational basis review cannot be applied to conduct falling within the scope of the second amendment's protection, the government bears the burden of justifying the constitutional validity of the law. *Id.* at 766-67.

¶ 67    First, we find that defendant has met his initial burden to show that the challenged provisions of the AUUW statute burden conduct falling within the scope of the second amendment's protection. See *Morgan*, 203 Ill. 2d at 486 (all statutes carry a strong

-15-

presumption of constitutionality, so the party challenging the statute bears the burden of establishing its constitutional infirmities). The "inherent right of self-defense has been central to the Second Amendment right." *Heller*, 554 U.S. at 628. Although "the need for defense of self, family, and property is most acute" in the home (*id.*), we believe logic dictates that an individual's need for self-defense does not disappear outside the home.

¶ 68 Certain conduct falls outside the scope of the second amendment's protection of the right to bear arms. For example, the carrying of dangerous or unusual firearms that are not typically possessed by law-abiding citizens for lawful purposes is categorically unprotected by the second amendment. *Id.* at 624-27; *Wilson*, 407 Ill. App. 3d at 774. The conduct at issue here, however, is not beyond the scope of the second amendment's protection. Specifically, the challenged provisions of the AUUW statute, which prohibit the carrying of an uncased, loaded and accessible firearm in the public street even by a law-abiding citizen for the lawful purpose of self-defense, imposes a burden on the inherent right to self-defense. Consequently, the challenged provisions of the AUUW statute implicate conduct that, while not at the core of the right to bear arms like the defense of hearth and home, falls within the scope of the right as it was understood at the time the second amendment was ratified. See *Heller*, 554 U.S. at 592-95 (general discussion of the historical background of the second amendment guarantee of the individual right to possess and carry weapons in case of confrontation).

¶ 69 Because the challenged AUUW provisions burden conduct within the scope of the second amendment guarantee, we evaluate the prohibition under the appropriate standard of constitutional scrutiny. The State argues that rational review is appropriate because the statute does not infringe upon a fundamental right. For support, the State cites *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 509, 511 (1984), where the Illinois Supreme Court applied a rational basis review and held that the right to possess a firearm was not a fundamental right and an ordinance banning possession of operable handguns did not violate the Illinois Constitution but, rather, was a permissible exercise of police power. We note, however, that the analysis and holding in *Kalodimos* have been impliedly overruled by *Heller* and *McDonald*. The law now establishes that the second amendment guarantee of the individual right to bear arms is a fundamental right incorporated to the states and is not subject to rational basis review.

¶ 70 Defendant argues that strict scrutiny should govern because a fundamental right is at issue. To satisfy strict scrutiny, the means employed by the legislature must be necessary to a compelling state interest, and the statute must be narrowly tailored, using the least restrictive means available to attain its purposes. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000).

¶ 71 We find that second amendment challenges, like first amendment challenges, can trigger more than one particular standard of scrutiny. The first amendment right to free speech is an enumerated fundamental right, yet it is subject to several standards of scrutiny depending on the type of speech and level of prohibition at issue. See *United States v. Marzzarella*, 614 F.3d 85, 96-98 (3d Cir. 2010) (discussing the application of intermediate scrutiny to content-neutral time, place and manner restrictions, or to regulations on nonmisleading commercial speech). Perhaps strict scrutiny may have applied to the severe prohibition on the particular

fundamental right at issue in *Heller*. *Heller* involved a total ban on having an operable handgun in one's home for the lawful purpose of self-defense, conduct that is at the core of the second amendment right. At issue here, however, are place and manner limits on carrying handguns outside of one's home and on public land, conduct that is not at the core of the second amendment right. As the *Heller* Court acknowledged, "the right secured by the Second Amendment is not unlimited" and "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

¶ 72    Shortly after the *Heller* decision, this court used a rational-basis level of scrutiny to review constitutional challenges to the AUUW statute and found the statute constitutional. See *People v. Williams*, 405 Ill. App. 3d 958 (2010) (defendant's AUUW conviction based on carrying a loaded handgun on a public street was constitutional under rational basis scrutiny). More recently, however, this court has discussed with approval the use of heightened scrutiny for reviewing second amendment challenges to statutory prohibitions on the right to bear arms. See *Wilson*, 407 Ill. App. 3d at 766-68; *People v. Aguilar*, 408 Ill. App. 3d 136, 145-46 (2011), *pet. for leave to appeal allowed*, No. 112116 (Ill. May 25, 2011). Consistent with *Wilson* and *Aguilar*, we find that heightened scrutiny must be applied to the review of prohibitions on conduct falling with the scope of the right to bear arms. We also find that the appropriate level of heightened scrutiny will depend upon the type of protected conduct that is burdened and the severity of the restriction that is challenged. See *Marzzarella*, 614 F.3d at 98-101 (a statute forbidding possession of firearms with obliterated serial numbers did not severely limit the right to possess firearms, survived intermediate scrutiny and would pass muster even under strict scrutiny).

¶ 73    In *Aguilar*, this court adopted intermediate scrutiny as the appropriate standard to review the defendant's second amendment challenge to his AUUW conviction, which was based on his carrying a loaded firearm at a time when he was not in his own home or place of business. *Aguilar*, 408 Ill. App. 3d at 145-46. A majority of the court concluded that the statute's purpose–to allow the State to seek a harsher penalty for violators because of the inherent dangers to police officers and the general public–was substantially related to that important governmental objective and the fit between the statute and that objective was reasonable. *Id.* at 146.

¶ 74    The intermediate scrutiny inquiry asks whether the challenged law served a significant, substantial or important governmental interest, and, if so, whether the fit between the challenged law and the asserted objective was reasonable, not perfect. *Wilson*, 407 Ill. App. 3d at 767. A reasonable fit "represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.' " *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989) (quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982)). Similar to *Aguilar*, the conduct at issue here–carrying an uncased, loaded and immediately accessible handgun on a public street–is not the type of core conduct like self-defense of hearth and home that is central to the second amendment guarantee. See *Heller*, 554 U.S. at 595 (the second amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation" (emphasis in original)). We find that intermediate scrutiny is the appropriate level of scrutiny to apply to the second amendment challenge at issue here.

¶ 75    First, we consider whether the statutory provisions against carrying uncased, loaded and accessible firearms in public on the street serve a significant, substantial or important government interest. In *People v. Marin*, 342 Ill. App. 3d 716, 723-24 (2003), this court looked at the history and language of the AUUW statute and determined that its overall purpose is to protect the public and police enforcement officers from the inherent dangers and threats to safety posed by any person carrying in public a loaded and immediately accessible firearm on his person or in his vehicle. Comments made during the legislative debate indicated that the AUUW statute addressed the broad issue of public concern regarding whether any people, not just street gang members, should have a gun easily accessible when they were stopped by police officers. *Id*. at 723. To accomplish the goals of safety and good order of society, the legislature regulated the possession and use of firearms not only by certain dangerous types of people, but also "by prohibiting the accessibility to loaded weapons in public places by society at large." *Id*.

¶ 76    The *Marin* court noted that the statute intended to "prevent situations where no criminal intent existed, but criminal conduct resulted despite the lack of intent, *e.g.*, accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or *** the danger of a police officer stopping a car with a loaded weapon on the passenger seat." *Id*. at 727. The court noted that even innocent motivations could be transformed "into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression." *Id*. Consequently, even the innocent "activity of possessing or transporting an accessible and loaded weapon is itself dangerous and undesirable, regardless of the intent of the bearer since it may lead to the endangerment of public safety." *Id*. Promoting and ensuring the safety of both the general public and police officers by limiting the accessibility of loaded firearms in public places and on public streets constitutes a substantial or important interest. See *Aguilar*, 408 Ill. App. 3d at 146; see also *People v. Ross*, 407 Ill. App. 3d 931, 942 (2011) (the government has an inherent and lawful power of restraint upon private rights as necessary and appropriate to promote society's health, comfort, safety and welfare even though the prohibitions invade an individual's right of liberty).

¶ 77    Next, we consider the fit between the challenged AUUW provision and its substantial and important goals. Defendant complains that the AUUW statute makes it impossible for law-abiding citizens to carry operable and loaded firearms in public for the lawful purpose of self-defense should a confrontation with another person arise. However, the carrying of uncased, loaded and accessible firearms in public on the street, even if for the purpose of self-defense, poses unusual and grave dangers to the public, particularly innocent bystanders who may be severely or fatally injured by stray bullets. Courts frequently hear cases involving claims of self-defense where unintended victims were shot, injured or killed. See, *e.g.*, *People v. Figueroa*, 381 Ill. App. 3d 828 (2008) (the defendant asserted he acted in self-defense when he fired a gun at rival street gang members during a car chase, but the unintended victim, a 12-year-old boy playing baseball with his younger brother, was shot in the chest by a stray bullet and killed). Furthermore, devastating consequences have resulted when the bearer of a firearm shot a perceived offender or threat in public but was mistaken about the need for self-defense. See, *e.g.*, *Daniels v. Police Board*, 338 Ill. App. 3d 851

-18-

(2003) (following a car chase, an unarmed passenger, who ignored police officers' instructions to show her hands and exit the car, was shot and killed by a police officer who saw a silver object and mistakenly thought the passenger was reaching for a gun). Even here, defendant alleged that he fired his gun at Richardson because defendant mistakenly thought Richardson was reaching for a gun.

¶ 78 Defendant argues that the challenged prohibition is not limited to individuals carrying a firearm in a sensitive place, like a school or government building. According to defendant, the *Heller* Court could not have intended that "sensitive places" meant everywhere except one's own home, land and fixed place of business. Defendant's argument, however, is not persuasive. The prohibition at issue here does not criminalize the carrying of firearms everywhere outside the individual's home, land or fixed place of business. Rather, the prohibition impacts the individual right to self-defense based upon factors concerning both where the firearm is carried and the manner in which it is carried. Specifically, if an individual is not on his land or in his home or place of business, then the gun cannot be carried uncased, loaded and in an accessible manner.

¶ 79 Contrary to defendant's assertion that the AUUW imposes a "blanket prohibition" on carrying firearms outside the home, the statute is limited to preventing the carrying of loaded, uncased and accessible firearms in public on the street. Certainly, the prohibited place at issue here, *i.e.*, in public on the street, is broad. Nevertheless, the prohibition is justified by the potential deadly consequences to innocent members of the general public when someone carrying a loaded and accessible gun is either mistaken about his need for self-defense or just a poor shot.

¶ 80 Defendant also argues that the challenged provisions of the AUUW statute are not necessary to protect the public because other provisions of the Criminal Code are more than adequate to satisfy the State's interest in deterring the use of firearms in violent crimes. Defendant cites, for example, the State's ability to prohibit possession of firearms by felons, the mentally ill, most minors, those possessing illegal drugs, those not complying with reasonable registration requirements, and those engaged in street-gang activity. We do not agree. As discussed above, the purpose of the AUUW statute is to advance public and police officer safety by eliminating the inherent threats posed by loaded and accessible firearms in public on the street. Certainly, the statutory prohibitions that defendant cites with approval are necessary components of the overall scheme to achieve the statute's goal of safety. Nevertheless, if the challenged provisions at issue here were stricken from the statute, that omission would defeat the statute's purpose of protecting the general public and police officers from the dangers of firearms in public places. Absent the challenged provisions, the statute would fail to prevent situations where criminal conduct was not intended but resulted nevertheless. See *Marin*, 342 Ill. App. 3d at 727.

¶ 81 We are not persuaded by defendant's implication that allowing an individual to carry a loaded and immediately accessible firearm in public for the lawful purpose of self-defense is not very different from that same individual's fundamental right to have a loaded and accessible handgun at home for the lawful purpose of self-defense. In his home, an individual generally may be better able to accurately assess a threat to his safety due to his familiarity with his surroundings and knowledge of his household's occupants. In public, however, there

is no comparable familiarity or knowledge, and, thus, an increased danger that an individual carrying a loaded firearm will jump to inaccurate conclusions about the need to use a firearm for self-defense. The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force.

¶ 82    Consequently, we find that the fit between the challenged provisions of the AUUW statute and the statute's substantial and important goal is absolutely reasonable although arguably somewhat imperfect. Accordingly, defendant's AUUW conviction must stand because the challenged statutory provisions do not violate either the second amendment or the Illinois Constitution. Illinois is not bound to interpret the Illinois Constitution provisions in lockstep with the Supreme Court's interpretation of the federal constitution. *People v. Mitchell*, 165 Ill. 2d 211, 217 (1995). However, while states are free to provide more protection than the U.S. Constitution requires, states may not provide less. *Simmons v. South Carolina*, 512 U.S. 154, 174 (1994) (Souter, J., concurring, joined by Stevens, J.); *California v. Ramos*, 463 U.S. 992, 1014 (1983). Defendant cites no authority to persuade us that the protection of his right to bear arms under the Illinois Constitution is greater than that afforded under the second amendment.

¶ 83                                    F. Fines, Fees and Costs

¶ 84    Finally, defendant challenges the trial court's imposition of various fines, fees and costs. The State concedes and we agree that the following fees or fines should be vacated as a matter of law: a $25 court supervision fee (625 ILCS 5/16–104c (West 2006)); a $5 drug court fee (55 ILCS 5/5–1101(f) (West 2006)); a $30 Children's Advocacy Center fine (55 ILCS 5/5–1101(f–5) (West 2008)); and a $100 trauma fund fine (730 ILCS 5/5–9–1.10 (West 2004)). Accordingly, we vacate these charges, which total $160.

¶ 85    In addition, defendant asserts, the State concedes, and we agree that defendant is entitled to receive credit for time served in presentence custody to satisfy his $10 mental health court fine and $5 youth diversion/peer court fine. Because defendant accrued at least 1,040 days of credit for time he spent in presentence custody (725 ILCS 5/110–14(a) (West 2004)), he is entitled to at least $5,200 credit against any creditable fines. The $10 mental health court and $5 youth diversion/peer court fines are the only creditable fines in this case. See *People v. Jones*, 223 Ill. 2d 569, 582, 699 (2006) (fines are part of the punishment for a conviction, whereas fees are intended to reimburse the State for a cost incurred in the defendant's prosecution). Consequently, we offset defendant's $10 mental health court and $5 youth diversion/peer court fines with his days of accrued presentence credit.

¶ 86    We do not agree, however, with defendant's claim that the trial court erroneously imposed the $50 court system fee. This fee was properly assessed against defendant because he was found guilty of felony offenses. 55 ILCS 5/5–1101(c) (West 2004). The trial court's order, however, erroneously states that this fee was imposed under section 5–1101(b) of the Counties Code (55 ILCS 5/5–1101(b) (West 2008)), which is not applicable here. Consequently, we correct that portion of the trial court's order to reflect the imposition of the fee under section 5–1101(c) of the Counties Code.

¶ 87                                    III. CONCLUSION

¶ 88       Accordingly, we affirm defendant's attempted first degree murder conviction, one of his
two AUUW convictions, and the sentences imposed on those convictions. We vacate,
however, his convictions and sentences for the aggravated battery with a firearm offense and
the second AUUW offense. We also affirm the imposition of the $50 court system fee, vacate
the imposition of the other challenged fees totaling $160, and offset the fines totaling $15
with accrued presentence credit.

¶ 89       Affirmed in part and vacated in part.