# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Alvarado*, 2011 IL App (1st) 082957

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEJANDRO ALVARADO, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-08-2957 |
| Filed | December 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for aggravated unlawful use of a weapon without a FOID card and possession of a handgun in the street while under 21 years of age, the first conviction was vacated under the one-act, one-crime rule, but the second conviction was upheld, despite defendant's contentions that his counsel was ineffective in eliciting testimony that opened the door for the State's introduction of testimony related to gang activity and that the statute was unconstitutional, since defense counsel's questions were based on a reasonable trial strategy of establishing that the police falsely attempted to connect defendant to a person involved in gang activity, and the prohibition against persons under 21 years of age possessing handguns outside their homes and in public regulates conduct that is not at the core of the second amendment right, it warrants at most intermediate scrutiny, it serves an important and substantial governmental interest, and it does not violate the equal protection clause. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-398; the Hon. Mary Margaret Brosnahan, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, Ahmed A. Kosoko, and Douglas R. Hoff, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Conor Fleming, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Hall concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a jury trial, defendant Alejandro Alvarado was convicted of aggravated unlawful use of a weapon (AUUW) and sentenced to two years of probation.

¶ 2 On appeal, he contends that: (1) his multiple convictions for AUUW violate the one-act, one-crime rule; (2) he received ineffective assistance from trial counsel, who elicited testimony concerning street gangs; (3) and his convictions under the AUUW statute should be vacated because the relevant provisions of the statute violate the constitutional guarantees of the right to keep and bear arms and equal protection.

¶ 3 For the reasons that follow, we hold that: (1) one of defendant's two convictions for AUUW must be vacated under the one-act, one-crime rule; (2) defendant was not denied effective assistance of counsel where counsel's questions of witnesses were consistent with the defense strategy to discredit the police officers' testimony and disassociate defendant from the co-arrestee who flashed gang signs at the scene; and (3) defendant's conviction for possession of a firearm in the street when he was under 21 years of age is affirmed because the relevant provisions of the AUUW statute do not violate the constitutional guarantees of the right to keep and bear arms and equal protection.

¶ 4 Accordingly, we vacate one conviction for AUUW and affirm the judgment of the circuit court in all other respects.

¶ 5                                I. BACKGROUND

¶ 6 On the afternoon of December 12, 2006, defendant was arrested after Chicago police officers, who were conducting surveillance from inside an unmarked squad car, allegedly

saw defendant on the street with a gun in his hand. Two police officers approached defendant, chased him into a residence, and recovered the Smith and Wesson .38-special bluesteel revolver he was carrying.

¶ 7    Prior to trial, defendant moved the court to quash his arrest and suppress evidence. He argued the court should suppress the handgun recovered inside his home and his postarrest statement because his home was illegally searched and he was illegally arrested. After a hearing, the trial court denied defendant's motion.

¶ 8    Defendant was tried before a jury on charges that he: (count I) knowingly carried on or about his person a handgun when he was not on his own land, or in his own abode or fixed place of business, and had not been issued a currently valid firearm owner's identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2006)); and (count II) knowingly carried on or about his person a handgun when he was not on his own land or in his own abode or fixed place of business and was under 21 years of age and in possession of a handgun (720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2006)).

¶ 9    At trial, Chicago police officer Angel Cahue testified for the State that he was conducting surveillance on the 3000 block of South Homan Avenue. He sat in the backseat of a parked, covert vehicle and relayed information to other surrounding officers via radio. Sergeant Jason Janopolous and Officer Sonia Aponte were also present in that car. Officer Medina was sitting in an unmarked car parked in an alley about one block north of Officer Cahue's location.

¶ 10    Officer Cahue saw a Jeep driven by Raudel Perez pull into a driveway on the east side of Homan Avenue. Defendant, who was in the passenger seat, exited the Jeep and had a brief conversation with Perez. Defendant held a handgun in his right hand. Defendant turned and began to cross the street, tucking the gun into the right side of his waistband so that the gun handle remained visible. Officer Cahue radioed for Officer Medina to approach. Officer Medina drove to the rear of 3040 South Homan Avenue, and ran from the alley, through the backyard and gangway to the front of the residence. Defendant was in the street in front of 3040 South Homan Avenue, and Officer Cahue had exited his car. The revolver was in defendant's waistband and his hand was on the handle of the gun.

¶ 11    Officer Cahue testified that the officers announced their office and told defendant to stop. Defendant looked at them and then ran into the gangway at 3040 South Homan Avenue. Officer Medina chased defendant, followed by Officer Cahue. Defendant ran inside a basement apartment, slamming the door in Officer Medina's face. Officer Medina immediately opened the unlocked door and followed defendant. When Officer Cahue caught up to them inside the apartment, Officer Medina had defendant lying facedown on the floor in protective custody. While Officer Cahue stayed with defendant, Officer Medina recovered the revolver from the bathroom.

¶ 12    Officer Cahue testified that when the officers entered the basement apartment, it was filthy and in complete disarray. Garbage was spilling over from garbage cans, dishes were piled up in the kitchen sink, and clothes were all over the floor. The officers did not search or ransack defendant's apartment. Defendant was advised of his rights and taken to the police station. Defendant then voluntarily told Officers Cahue and Medina that a male pulled a gun

-3-

on defendant and shot at him the previous day. Defendant also said that he would not call the police because he was his own protection. Defendant's statement was not videotaped or tape-recorded because this case did not involve a homicide. Officer Cahue took steps to verify whether the prior shooting incident had occurred.

¶ 13    Officer Cahue testified that Raudel Perez was also arrested at the scene for reckless conduct where he attempted to create a diversion by flashing gang signs and yelling gang slogans when the police were chasing defendant. Furthermore, no females were around the area when defendant was out on the street with the gun. In addition, defendant was 20 years old at the time of the arrest and did not have a FOID card.

¶ 14    Officer Medina testified consistently with Officer Cahue. Officer Medina added that when defendant ran into the basement and the door slammed closed, Officer Medina immediately opened the unlocked door and saw defendant in the vestibule area still in possession of the revolver. Defendant ran into a bathroom that was less than 10 feet from the vestibule, pulled the revolver from his waistband, and tossed it into the top of an uncovered, water-filled toilet tank. Defendant then moved away from the toilet, got on the ground, and cooperated with the officers' orders. Furthermore, at the police station, defendant told the officers that a rival gang member pulled a gun on him the day before. Officer Medina did not ask defendant when or where the incident happened or the name of anyone defendant may have thought was the offender. Officer Medina explained that he did not make a tape or video recording of defendant's postarrest statement because the matter was treated as a gun case, not a homicide case.

¶ 15    Sergeant Janopolous testified that he supervised the surveillance in this matter and was the driver in the covert vehicle with Officer Cahue. Sergeant Janopolous saw the Jeep driven by Perez pull into the driveway. Defendant, who was the passenger, then exited the Jeep and started to walk across the street. Perez exited the Jeep soon thereafter. When Officers Medina and Cahue chased defendant, Perez started flashing Latin King gang signs and yelling gang slogans and began to cross the street. At that point, Sergeant Janopolous and Officer Aponte exited their car and, in order to provide additional protection for the officers that chased defendant, arrested Perez for reckless conduct. Sergeant Janopolous testified consistently with Officers Cahue and Medina concerning the condition of the basement apartment. Sergeant Janopolous testified that the officers did not break the basement door or search the basement apartment. The officers were only inside the apartment for a couple of minutes before they all returned to the police station.

¶ 16    Amber Huerta testified for the defense. She lived across the street from defendant and knew him as a family friend. She was home at the time of the incident and looked out her window because a green truck playing loud music drove into the driveway next to her home. Two men were in the truck, but defendant was not with them. Furthermore, defendant was not around on the street. Two Hispanic male police officers searched the truck and its two occupants. Then more officers came and they ran to the house next door to defendant's home and spoke with someone at that residence. Next, the officers went to the second floor of defendant's home, but no one answered the door. The officers then went through the gangway, and Huerta lost sight of them. About 10 minutes later, the officers came outside with defendant, took him to the two men from the truck, and searched them. Huerta knew

-4-

that defendant was arrested for having a gun, realized her information was important, but never told the police that someone other than defendant was the truck passenger. Moreover, prior to trial, Huerta refused to give a statement to the State's investigator in this case.

¶ 17    Defendant testified that he had been at home all day before the police burst into his apartment. Specifically, he was alone when he heard two loud knocks on the door. Then, the police knocked the door off its hinges and entered. The first officer, a big white man, came in with his gun drawn, and two others came in and began searching the apartment. While defendant lay facedown on the floor for about 15 minutes, the officers pulled cabinets down, flipped and tore couches, and went through drawers. The police took him to the washroom, where they had removed the toilet tank cover and claimed to have found a gun. Defendant testified that he never put a gun in the toilet tank and did not know how the toilet tank cover disappeared. Photographs of defendant's home in disarray were introduced into evidence. Defendant, however, acknowledged that he did not present any photographs from family functions, etc., that would have shown the condition of his home prior to the date of his arrest.

¶ 18    Defendant did not remember being told his *Miranda* rights and never made a statement that someone shot at him the day before his arrest. Defendant acknowledged that his neighborhood was in Latin King territory but testified that he was not in a street gang, had never been in one, and did not have any gang tattoos. Although defendant had seen Perez around for probably one month, defendant did not know Perez was a Latin King and was not in Perez's Jeep on the date of the incident.

¶ 19    The State recalled Officer Cahue as a rebuttal witness. Officer Cahue testified that after the arrest he asked defendant if he was in a gang, and defendant said he was a Latin King. Officer Cahue documented that statement in his offense report.

¶ 20    The jury found defendant guilty of both counts of AUUW where he did not possess a valid FOID card (count I), and where he was under 21 years of age at the time of the offense (count II). He was then sentenced to two years of felony probation. Defendant appealed.

¶ 21                                  II. ANALYSIS
¶ 22                           A. One-Act, One-Crime Rule
¶ 23    When a defendant is convicted of two offenses based upon the same, single physical act, the court must vacate the less-serious offense. *People v. Johnson*, 387 Ill. App. 3d 780, 793 (2009). The State concedes that one of defendant's two convictions for AUUW must be vacated under the one-act, one crime rule because multiple convictions are improper if they arise out of the same physical act. *People v. Crespo*, 203 Ill. 2d 335, 340-41 (2001). Both of defendant's AUUW convictions are based on the same, single act of possession of the same revolver. Moreover, both offenses are Class 4 felonies. See 720 ILCS 5/24-1.6(d) (West 2006). Because defendant's constitutional challenges to the AUUW statute are not significantly impacted by which offense is vacated, we will address his constitutional challenges under the more general charge of (count II) possession of a handgun in the street when he was under 21 years of age. Consequently, we vacate defendant's AUUW conviction under count I, which was based on his possession of a handgun in the street without a valid

FOID card.

¶ 24                    B. Ineffective Assistance of Trial Counsel

¶ 25    Defendant contends that trial counsel provided ineffective assistance by eliciting irrelevant and inflammatory testimony which suggested that the offense was gang-related. Specifically, defendant complains his trial counsel should not have elicited on cross-examination testimony (1) from Officer Cahue that Perez, defendant's co-arrestee, was arrested for flashing gang signs and shouting gang slogans; and (2) from Officer Medina that defendant told the officers a rival gang member shot at defendant the day before his arrest. According to defendant, that cross-examination opened the door for the State to present evidence that the neighborhood was considered Latin King territory and defendant told the police after his arrest that he was a member of that street gang. We do not agree.

¶ 26    To obtain relief, defendant must show not only that his lawyer's performance fell below an objective standard of reasonableness, but also that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984). A reviewing court must consider the totality of the evidence before the fact finder in determining whether a defendant has established his attorney's unreasonable errors and the reasonable probability of a different result. *Strickland*, 466 U.S. at 695. The prejudice prong of this *Strickland* test may be satisfied if defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). The failure to satisfy either the performance or the prejudice prong of the *Strickland* test will preclude a finding of ineffective assistance of counsel. *People v. Johnson*, 368 Ill. App. 3d 1146, 1161 (2006).

¶ 27    Before we address defendant's ineffective assistance of counsel claim, we must clarify the trial court's ruling on the parties' motions *in limine*. Defendant asserts, without citation to the record, that prior to the start of the trial, "the trial court ruled that the case was not gang-related and that no gang evidence would be introduced." Our review of the record, however, establishes that the trial court made no such ruling. The trial court's ruling was actually much narrower. It addressed whether the State could present evidence that the police were at the scene conducting surveillance as a result of receiving information from an unknown citizen that someone would be carrying a gun in order to retaliate for a prior shooting incident involving street gangs. The trial court did not preclude any mention of street gang activity but, rather, precluded the State from eliciting the hearsay information obtained from the unknown citizen, who was not available for cross-examination.

¶ 28    According to the record, before jury selection on July 14, 2008, the trial court addressed the parties' motions *in limine*. After ruling on several of the State's oral motions *in limine*, the State sought guidance regarding the extent to which the officers could testify about the reason they had set up surveillance at 30th Street and Homan Avenue. The State explained that the police had defendant's name and photo because an unknown citizen told the police that there was going to be a gang retaliation and defendant was going to be the one with the gun. Furthermore, an offense case report indicated that on a previous day defendant was shot at by unknown rival gang members. The State sought leave to present the facts that the

officers were familiar with that block based on gang activity and had information that a gang retaliation was going to take place.

¶ 29    The defense objected, arguing defendant would not be able to cross-examine the source of that information. The defense explained that a telephone call to the police was apparently the source of the information, but the person connected to the relevant telephone number denied making any such call and denied any knowledge of the matter.

¶ 30    Due to concerns involving hearsay and prejudice resulting from the denial of the right to confront witnesses, the trial court precluded the State from mentioning any information supplied by the unknown citizen. The trial court limited the State on direct examination to presenting testimony that the police were at the location "on surveillance pursuant to a continuing investigation."

¶ 31    The trial court then addressed the admissibility of defendant's postarrest statement that a male pulled a gun on him on a previous day, defendant was not going to call the police, and defendant was his own protection. Defense counsel asked the court to preclude any use of defendant's postarrest statement because it was not written or recorded, defendant denied being shot at and denied making the postarrest statement, and the statement was inconsistent with the information supposedly supplied by the unknown citizen.

¶ 32    The trial court ruled that defendant's postarrest statement was relevant and admissible, the defense's cross-examination could challenge whether defendant ever made the postarrest statement, and the jury would decide what weight to give that evidence.

¶ 33    Defense counsel argued that he felt "boxed-in" by the trial court's ruling and the State should not be allowed to use defendant's entire postarrest statement. Defense counsel agreed with the court's ruling to preclude any reference to the information received from the unknown citizen. However, if defendant's postarrest statement was admissible, defense counsel was concerned that he might have to refer to some of the precluded information. Specifically, in order to challenge the notion that defendant made the alleged postarrest statement, counsel might refer to the precluded information in order to show that the facts supposedly supplied by the unknown citizen were not even consistent with the facts in the postarrest statement the police attributed to defendant.

¶ 34    The State expressed concern that if the police officers were cross-examined about what information they had prior to going to the scene, then some of the precluded information might come out.

¶ 35    The trial court did not alter its ruling, but acknowledged that defendant's cross-examination of the officers about what they knew prior to their surveillance might open some doors to gang activity or shootings that happened earlier. If that happened, the trial court would address the matter in a sidebar before the State's redirect or cross-examination.

¶ 36    Then the trial court asked if there were any further motions *in limine* to address. Defense counsel said he had "a formal one on the gang issue but [the court] already ruled on that [and counsel would file it]." Defense counsel asked "that the State have a clean folder for the jury so that nothing–gang affiliation or pending charges not be open and visible for that." The trial court asked the State to keep any information or exhibits not yet admitted into evidence away from the jury's sight line. Thereafter, jury selection commenced.

¶ 37    The record contains defendant's motion *in limine*, file stamped July 14, 2008, to prohibit the State from introducing evidence of any gang involvement by defendant. The motion alleged that defendant had no gang tattoos, markings or scars, made no motions consistent with gang involvement while the police observed him, and was not in the company of any other individuals that would indicate gang involvement. The motion also alleged that, aside from the arrest information and general offense report, no reports supported the officers' contention that this case was gang-related. The motion argued that the introduction of gang evidence would be more prejudicial than probative in this particular case. There is no indication in the record that a ruling was made on this motion or that the issue raised therein was presented to the trial court.

¶ 38    During the cross-examination of Officer Cahue, defense counsel elicited testimony that at the time of defendant's arrest, the police also arrested Perez for reckless conduct where "he was outside acting up, flashing gang signs and gang slogans, attempting to create a diversion." Later, when defense counsel cross-examined Officer Medina about his failure to follow through on defendant's alleged statement that someone had fired a gun at him, the following exchange occurred:

"Q. So here you have an individual who had just told you that somebody may have shot at him, correct?

A. Right.

Q. Did you ask him who?

A. Yes.

Q. Who did you get?

MS. GOLDFISH [Assistant State's Attorney]: Objection.

THE COURT: Overruled. You may tell us.

A. He said it was a rival gang."

Defense counsel continued to question Officer Medina regarding whether defendant mentioned the time and location of the prior shooting incident and any names of the people involved. Counsel then questioned Officer Medina regarding his failure to make a tape or video recording of defendant's alleged statement or have him write or sign it.

¶ 39    Thereafter, defendant testified on direct that he was never in a gang, did not have any gang tattoos, and never made a postarrest statement to Officer Cahue or Medina. On cross-examination, he testified that he had lived on his block for about 15 years and knew that it was Latin King territory. He was not a Latin King and did not know whether Perez was a Latin King.

¶ 40    After the defense rested, the State sought leave to have rebuttal witness Officer Cahue testify that, after defendant's arrest, Officer Cahue asked him whether he was affiliated with a gang, defendant said he was a member of the Latin Kings, and Officer Cahue documented that statement in his general case report.

¶ 41    Defense counsel responded:

"[W]e have been hearing gangs about this over our objection the entire time from every state witness that has come up there. So I had to rebut their violation of that particular

-8-

issue by asking [defendant] if he was in a gang or not."

¶ 42    The trial court, however, corrected defense counsel, noting that the State did not introduce any information regarding street gangs during the direct examinations of the police officers. The trial court stated:

> "So I just resent the implication that you make in your argument that there [have] been numerous violations of a motion *in limine* and people have been trotting out gangs from start to finish. That was not the case. The record does not show that."

The trial court clarified that Officer Cahue's rebuttal testimony was not allowed based on the defense opening any door to evidence about gang membership as a result of the defense's cross-examination of the police officers. Instead, the rebuttal testimony was allowed because it was relevant on the issue of defendant's credibility where he testified on direct examination that he was never a member of a gang.

¶ 43    Based upon the above summary of the course of the trial, we now address defendant's ineffective assistance of counsel claim. Specifically, defendant challenges counsel's cross-examination that elicited (1) Officer Cahue's testimony that Perez was arrested for flashing gang signs and (2) Officer Medina's testimony that defendant told the officers a rival gang previously shot at him. According to defendant, there was no valid tactical reason to have so cross-examined Officers Cahue and Medina under the circumstances, so counsel's challenged actions cannot be attributed to trial strategy.

¶ 44    Defendant fails to meet his burden under the first prong of *Strickland* to show that defense counsel's conduct at trial fell below an objective standard of reasonableness. In reviewing an attorney's actions, we show deference to the attorney's decisions, and the defendant must overcome the presumption that counsel's challenged action was trial strategy. *Strickland*, 466 U.S. at 689. There is a strong presumption that an attorney's actions fall within the wide range of choices that could be considered adequate counsel. *Id*. Matters of trial strategy include whether to offer certain evidence or call particular witnesses, whether and how to conduct cross-examination, and what motions to make. *People v. Anderson*, 266 Ill. App. 3d 947, 956 (1994).

¶ 45    The defense strategy entailed convincing the jury that defendant was not on the street at the time of the alleged incident and the police unlawfully burst into his apartment, detained him in his living room while they conducted an illegal search, and supposedly recovered a gun in the bathroom. To accomplish this strategy, the defense attempted to convince the jury that the police, in order to justify their warrantless search, lied about conducting the undercover surveillance, falsely connected defendant to someone who was involved in gang activity, fabricated defendant's postarrest statement, and invented the incident about someone pulling a gun on defendant in order to manufacture a motive for defendant to have the gun.

¶ 46    Consistent with this strategy, counsel elicited Officer Cahue's testimony that it was actually the co-arrestee, Perez, who was flashing gang signs and yelling gang slogans at the scene. This line of questioning hardly opened the door to testimony about gang activity where the defense knew that Sergeant Janopolous also would testify during the State's case-in-chief and would likely discuss, *inter alia*, the behavior by Perez that resulted in his arrest. Sergeant Janopolous testified after Officer Cahue, and defendant cites no authority to support

any argument that Sergeant Janopolous's testimony regarding Perez's conduct at the scene was not admissible. Accordingly, the defense pursued the strategy of disassociating defendant from Perez by presenting the testimony of eyewitness Huerta and defendant. Huerta knew defendant as a family friend for several years and testified that he was not even on the street, let alone in Perez's Jeep. Defendant, who had lived in that neighborhood for several years, insisted that he had never been in a street gang and did not have any gang tattoos. Any contrary testimony by the police that defendant was involved in gang activity was, according to the defense, just another lie to invent a motive and justify the warrantless search and arrest of defendant.

¶ 47    Defense counsel's cross-examination of Officer Medina was also consistent with the defense's strategy to show the jury that the police invented both the prior shooting incident and defendant's postarrest statement in order to manufacture a motive for defendant to have a gun on the street on the day of his arrest. Specifically, counsel challenged as irrational the notion that an arrested person would tell the police that he was carrying a gun because someone had shot at him a day ago and the police would respond as casually as Officers Cahue and Medina seemed to have acted in this case. Based upon the trial court's ruling on the motion *in limine*, the State could not present the hearsay evidence about the unknown citizen's report to the police that defendant was going to be part of a gang retaliation. As a result, counsel was able to attack Officer Medina for failing to question defendant and uncover the who, what, when and where of the prior shooting incident, and Officer Medina could not respond that the police, before they conducted the undercover surveillance that resulted in defendant's arrest, had already received a tip that defendant would be involved in a gang retaliation as a result of the prior shooting incident.

¶ 48    Furthermore, Officer Medina's testimony that defendant said a rival gang shot at him did not open the door to irrelevant and inflammatory testimony about street gangs. As the trial court clarified, the State's leave to present Officer Cahue's rebuttal testimony–that defendant said he was a Latin King–was not based upon any door being opened by defense counsel's cross-examination of the police officers. Rather, the rebuttal testimony was admissible solely because it was relevant to the issue of defendant's credibility where he testified on direct examination that he was never a member of a street gang.

¶ 49    Defense counsel's challenged actions were reasonable and consistent with the strategy to discredit the testimony of the State's witnesses that the officers observed defendant in the street carrying the gun and defendant made an incriminating postarrest statement. Even assuming, *arguendo*, that counsel's strategy was not perfect, "[m]istakes in strategy or tactics do not, alone, amount to ineffective assistance of counsel, nor does the fact that another attorney might have handled things differently; in fact, counsel's strategic choices are 'virtually unchallengeable.' " *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *People v. Palmer*, 162 Ill. 2d 465, 479 (1994)).

¶ 50    The record establishes that counsel provided effective and competent representation by challenging prior to trial the warrantless search of defendant's home, his arrest and the admissibility of his postarrest statement. Counsel also delayed the trial until the defense had obtained all relevant information concerning the unknown informant and Perez's arrest and investigated those matters. Furthermore, the defense successfully precluded, on hearsay

grounds, the evidence concerning the police officers' course of conduct and reason for conducting the surveillance. In addition, the defense thoroughly cross-examined the State's witnesses, raised numerous objections to the State's evidence, moved for a directed verdict on the sufficiency of the FOID card evidence, and presented witnesses and exhibits on defendant's behalf. See *People v. Shatner*, 174 Ill. 2d 133, 147-48 (1996) (defense counsel was not ineffective where he offered rigorous cross-examinations and witnesses on the defendant's behalf). Consequently, defendant fails to show that counsel's performance fell below an objective standard of reasonableness.

¶ 51 Defendant also fails to meet his burden under the second prong of *Strickland* to show a reasonable probability that, absent any errors by counsel, the jury would have had a reasonable doubt that defendant had a handgun on the street on the date in question. The complained-of testimony concerning street gangs was not overly prejudicial where Officers Cahue and Medina testified clearly, consistently and credibly that they saw defendant on South Homan Avenue with a revolver in his hand and waistband. In contrast, defense witness Huerta and defendant gave vague or inconsistent physical descriptions of the officers involved in defendant's arrest. Furthermore, defendant did not present any photographic evidence to counter the officers' testimony that his home was in complete disarray before the officers ever entered it. Defendant also could not explain how his toilet tank cover mysteriously disappeared during the alleged illegal search and randsacking of his home.

¶ 52 The fact that defense counsel's cross-examination of Officers Cahue and Medina elicited very brief references to street gangs neither opened the door to a flood of gang evidence nor raised a reasonable probability that the challenged testimony so colored the jury as to force a conviction regardless of the evidence in this case. Defendant has failed to meet his burden under *Strickland*.

¶ 53 ### C. Constitutionality of the AUUW Statute

¶ 54 As discussed above, defendant is subject to only one AUUW conviction pursuant to the one-act, one-crime rule. Accordingly, we will address his constitutional challenge based on his conviction that he knowingly carried on or about his person a handgun when he was not on his own land or in his own abode or fixed place of business and was under 21 years of age and in possession of a handgun, in violation of section 24-1.6(a)(1), (a)(3)(I) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2006)). Whether a statute is constitutional is a question of law to be reviewed *de novo*. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005).

¶ 55 ### 1. Right to Keep and Bear Arms

¶ 56 The second amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 628-30 (2008), a majority of the Supreme Court concluded that a total ban on the possession of operable handguns in the home, "where the need for defense of self, family, and property is most acute," made it "impossible for citizens to use them for the core lawful purpose of self-

-11-

defense." Such a ban could not withstand any level of heightened scrutiny and, thus, violated the second amendment. *Id*. at 628-29.

¶ 57    Initially, defendant contends the act of carrying a handgun is conduct that enjoys the core protection of the second amendment and, thus, may not be criminalized. According to defendant, the AUUW statute requires no evidence of an unlawful or violent purpose and punishes the mere possession and carrying of a firearm. This court has already addressed and rejected similar arguments in *People v. Aguilar*, 408 Ill. App. 3d 136 (2011), *appeal allowed*, No. 112116 (Ill. May 25, 2011), and *People v. Mimes*, 2011 IL App (1st) 082747, *pet. for leave to appeal filed*, No. 112728 (Ill. July 25, 2011). In upholding a law-abiding citizen's right to possess an operable handgun "in defense of hearth and home," the Supreme Court stated that the second amendment's guarantee of an individual right to possess and carry weapons in case of confrontation, like the first amendment's right of free speech, is not unlimited. *Heller*, 554 U.S. at 592, 595, 635. The Supreme Court did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation." (Emphasis in original.) *Id*. at 595. The right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626.

¶ 58    In *Aguilar* and *Mimes*, this court adopted intermediate scrutiny as the appropriate standard to review the defendants' second amendment challenges to their AUUW convictions, which were based on their carrying of loaded firearms when they were not on their own land, or in their home or fixed place of business. *Aguilar*, 408 Ill. App. 3d at 145-46; *Mimes*, 2011 IL App (1st) 082747, ¶ 72. This court held that the statute's purpose to promote and ensure the safety of both the general public and police officers by limiting the accessibility of loaded firearms in public places and on public streets constituted a substantial or important interest and that the fit between that objective and the statute was reasonable. See *Aguilar*, 408 Ill. App. 3d at 146; *Mimes*, 2011 IL App (1st) 082747, ¶ 76.

¶ 59    Here, defendant also argues that his AUUW conviction should be vacated because the relevant provision of the AUUW statute criminalizes the carrying of handguns by 18-, 19-, and 20-year-old adults in public for the lawful purpose of self-defense and, thus, facially violates the federal constitutional guarantee of the right to bear arms. The challenged provision of the AUUW statute provided, in pertinent part, as follows:

"(a) A person commits the offense of [AUUW] when he or she knowingly:

(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm; ***

***; and

(3) One of the following factors is present:

* * *

(I) the person possessing the weapon was under 21 years of age and in possession of a handgun as defined in Section 24-3, unless the person under 21 is engaged in lawful activities under the Wildlife Code or described in subsection 24-2(b)(1), (b)(3), or 24-2(f)." 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2006).

-12-

Defendant argues 18-to-20-year-old adults have reached the age of majority and are full rights holders. Defendant states that they are not deemed dependent by society, their judgment is not placed in question, and they are eligible for military service. Defendant concludes that there is nothing about 18-to-20-year-old adults that makes them unusually dangerous so as to justify a "total ban" on their handgun possession. Defendant contends that even though the second amendment allows reasonable regulation of the individual right to keep and bear arms, the challenged provision of the AUUW statute fails to satisfy any level of heightened scrutiny.

¶ 60    To support his position, defendant cites portions of the Supreme Court's discussion in *Heller* concerning the historic right of younger adults to carry firearms. Specifically, defendant states that the second amendment secures the militia by ensuring a populace familiar with arms. See *Heller*, 554 U.S. at 599-601. Moreover, the Framers conceived of an unorganized militia composed of able-bodied men who could be called in defense of their country as the federally organized militia. See *id*. at 595-96. Furthermore, the first militia act passed by Congress enrolled in the organized militia all able-bodied white male citizens who were at least 18 years of age and under 45. See *id*. at 596. Defendant asserts that the Framers did not exempt 18-to-20-year-old adults from the guarantees of the second amendment or intend them to be kept unfamiliar with arms by being stripped of their second amendment rights.

¶ 61    Defendant inaccurately characterizes section 24-1.6(a)(1), (a)(3)(I) of the Criminal Code as a "total ban" on handgun possession by young adults. This provision is limited to the carrying of a handgun when the person is not on his own land or in his abode or fixed place of business. Furthermore, this provision contains exceptions and, thus, does not affect the person under 21 years of age who is engaged in lawful activities under the Wildlife Code (520 ILCS 5/1.1 *et seq.* (West 2006)), members or patrons of target shooting ranges (720 ILCS 5/24-2(b)(1), (f) (West 2006)), or licensed hunters (720 ILCS 5/24-2(b)(3) (West 2006)). Section 24-2 contains additional exemptions concerning an individual's employment or military service. 720 ILCS 5/24-2 (West 2006).

¶ 62    For the reasons that follow, we hold that the provision of the AUUW statute at issue here does not violate the constitutional protection of the right to bear arms.

¶ 63    This court has used a two-part approach to second amendment claims. *Wilson v. Cook County*, 407 Ill. App. 3d 759, 768 (2011), *appeal allowed*, No. 112026 (Ill. May 25, 2011) (discussing several federal court cases that used a similar approach for second amendment claims).

> "First, the court considers whether the challenged law imposes a burden on conduct falling within the scope of the second amendment's guarantee. [Citation.] This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right to bear arms when the second amendment was ratified. [Citation.] If the challenged law does not burden protected conduct, then the law is valid, provided that it satisfies the due process mandate of rationality in lawmaking. [Citations.] However, if the challenged law burdens conduct that was within the scope of the right, then the court applies an appropriate form of heightened means-end scrutiny. [Citation.] Because

a rational basis review cannot be applied to conduct falling within the scope of the second amendment's protection, the government bears the burden of justifying the constitutional validity of the law. [Citation.]" *Mimes*, 2011 IL App (1st) 082747, ¶ 66.

¶ 64 Defendant has met his initial burden to show that the challenged provision of the AUUW statute burdens conduct falling within the scope of the second amendment's protection. The conduct at issue here–possession in public of a handgun by an 18-to-20-year-old adult who may be a law-abiding citizen carrying the handgun for the purpose of self-defense–is not at the core of the right to bear arms like the defense of hearth and home. Nevertheless, this conduct is not completely beyond the scope of the second amendment's protection. See *Heller*, 554 U.S. at 592-95 (general discussion of the historical background of the second amendment guarantee of the individual right to possess and carry weapons in case of confrontation).

¶ 65 Because the challenged AUUW provision burdens conduct within the scope of the second amendment guarantee, we evaluate the prohibition under the appropriate standard of constitutional scrutiny. Defendant argues that strict scrutiny should govern because a fundamental right is at issue. We disagree. This court previously ruled that second amendment challenges, like first amendment challenges, can trigger more than one particular standard of scrutiny. *Mimes*, 2011 IL App (1st) 082747, ¶ 71 (the first amendment right to free speech is an enumerated fundamental right, yet it is subject to several standards of scrutiny depending on the type of speech and level of prohibition at issue); see also *United States v. Marzzarella*, 614 F.3d 85, 96-98 (3d Cir. 2010) (discussing the application of intermediate scrutiny to content-neutral time, place and manner restrictions, or to regulations on nonmisleading commercial speech).

¶ 66 Here, the challenged provision is not a total ban on conduct that is at the core of the second amendment right, such as the total ban in *Heller* on having an operable handgun in one's home for the lawful purpose of self-defense. The provision, which involves place, type of firearm, and age limits on the right to self-defense, limits the ability of individuals under 21 years of age to carry handguns outside their homes and in public. However, various exceptions and exemptions apply to protect the rights of young adults to engage in lawful activities like hunting and target shooting. The regulated conduct at issue here is not at the core of the second amendment right. Consequently, intermediate scrutiny is the appropriate level of heightened scrutiny to apply here based upon the type of protected conduct that is burdened and the severity of the restriction that is challenged. See *Mimes*, 2011 IL App (1st) 082747, ¶ 74.

¶ 67 The intermediate scrutiny inquiry asks whether the challenged law served a significant, substantial or important governmental interest, and, if so, whether the fit between the challenged law and the asserted objective was reasonable, not perfect. *Wilson*, 407 Ill. App. 3d at 767. A reasonable fit "represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.' " *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989) (quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982)).

¶ 68 First, we consider whether the statutory provision against a person under 21 carrying a

handgun in public on the street serves a significant, substantial or important government interest. In *Mimes*, this court discussed the important general interest addressed by the AUUW statute, *i.e.*, to protect the public and police enforcement officers from the inherent dangers and threats to safety posed by any person carrying in public a loaded and immediately accessible firearm on his person or in his vehicle. *Mimes*, 2011 IL App (1st) 082747, ¶ 76. In particular, "the statute intended to 'prevent situations where no criminal intent existed, but criminal conduct resulted despite the lack of intent, *e.g.*, accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or *** the danger of a police officer stopping a car with a loaded weapon on the passenger seat.' " *Id.* (quoting *People v. Marin*, 342 Ill. App. 3d 716, 727 (2003)). Even innocent motivations could be transformed "into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression." *Marin*, 342 Ill. App. 3d at 727.

¶ 69    Those substantial and important government interests remain relevant in this appeal. Nevertheless, we recognize that the challenged statutory provision here restricts someone under 21 from carrying a handgun in public, regardless of whether the handgun is loaded and immediately accessible. Comments made during the legislative debates indicate that the legislature recognized that it was treating adults under 21 years of age differently in order to "recognize the activity of gang members or young kids in certain parts of the state that are active in gangs" and address the concern that gang members should be one of the groups targeted by this legislation. 91st Ill. Gen. Assem., House Proceedings, April 10, 2000, at 54-55 (statements of Representative Cross).

¶ 70    We conclude from that discussion that the legislature sought to deter 18-to-20-year-old adults from carrying handguns, which threaten both the public and police officers, because the 18-to-20-year-old group was heavily at risk for illegal gang-related activity. Furthermore, that age group was more likely to be directly interacting with and, thus, endangering juveniles. We find that the challenged provision serves a substantial and important government interest to reduce in this state the armed violence and illegal activity of street gangs and others by preventing those under 21 years of age from carrying handguns in public, except in certain limited circumstances.

¶ 71    We also find that the fit between the challenged AUUW provision and its substantial and important goal is absolutely reasonable although arguably somewhat imperfect. Defendant's argument that the 18-to-20-year-old group is not unusually dangerous is not persuasive given the statistics concerning the use of handguns among that group in matters involving illegal street gang activity and other crimes. Moreover, the statute provides for exceptions and exemptions to protect the rights of law-abiding 18-to-20-year-old adults to engage in hunting, target shooting, etc.

¶ 72    As discussed above, the purpose of the challenged provision is to advance public and police officer safety by eliminating the inherent threats posed by young adults carrying handguns in public on the street. Because we find that the fit between the challenged provision of the AUUW statute and the statute's substantial and important goal is absolutely reasonable, the challenged statutory provision does not violate the second amendment and defendant's AUUW conviction must stand.

¶ 73                                                    2. Equal Protection

¶ 74        Finally, defendant argues his AUUW conviction violates the equal protection clause of the fourteenth amendment to the United States Constitution because the challenged statutory provision that prohibits adults 18, 19 and 20 years old from possessing handguns impermissibly burdens the fundamental right to bear arms. Defendant contends this legislative classification is subject to strict scrutiny under the equal protection clause because it impinges on the fundamental right to bear arms for self-defense.

¶ 75        Legislative enactments have a strong presumption of constitutionality, and we are required to uphold the constitutionality of a statute whenever reasonably possible. *People v. Alcozer*, 241 Ill. 2d 248, 259 (2011). The party challenging the constitutionality of the statute has the burden to prove its invalidity. *Id.*

¶ 76        The constitutional right to equal protection of the laws requires the government to treat similarly situated persons in a similar manner. *People v. Warren*, 173 Ill. 2d 348, 361 (1996). The guarantee of equal protection "does not preclude the State from enacting legislation that draws distinctions between different categories of people, but it does prohibit the government from according different treatment to persons who have been placed by a statute into different classes on the basis of criteria wholly unrelated to the purpose of the legislation." *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 322 (1996).

¶ 77        To ensure that the State has not exercised its power to classify arbitrarily, courts analyze legislation under equal protection by applying different levels of scrutiny depending on the statutory classification involved. *Id.* at 323.

       "It is the nature of the right affected that dictates the level of scrutiny we employ in determining whether the statute meets constitutional requirements. [Citation.] If the challenged statute implicates a fundamental right or discriminates based on a suspect classification of race or national origin, the court subjects the statute to 'strict scrutiny' analysis and will uphold the statute only if it is narrowly tailored to serve a compelling State interest. [Citations.] Under an equal protection analysis, suspect classifications are based on race or national origin. [Citation.]

       If the statute does not affect a fundamental constitutional right or involve a suspect classification, the rational basis test applies, requiring the statute bear a rational relationship to the purpose the legislature intended to achieve by enacting it. [Citation.] Additionally, '[a] third tier of constitutional scrutiny lies between deferential rational basis review and strict scrutiny, and is known as intermediate scrutiny,' and has been applied to review classifications based on gender, illegitimacy, and those classifications that cause 'certain content-neutral, incidental burdens to speech.' [Citation.]" *Alcozer*, 241 Ill. 2d at 262-63.

¶ 78        Defendant acknowledges that courts have applied the rational basis standard for purposes of an equal protection analysis of an age-based classification because courts have routinely held that age is not a suspect class for purposes of equal protection analysis. See *People v. M.A.*, 124 Ill. 2d 135, 140 (1988). Defendant, however, argues that section 24-1.6(a)(1), (a)(3)(I) of the Criminal Code impinges upon a fundamental right and is therefore subject to strict scrutiny. Specifically, defendant asserts that the age classification in the challenged

provision of the AUUW statute burdens the fundamental right to keep and bear arms for self-defense.

¶ 79     Fundamental rights "lie at the heart of the relationship between the individual and a republican form of nationally integrated government." *People ex rel. Tucker v. Kotsos*, 68 Ill. 2d 88, 97 (1977). As discussed above, the challenged statutory provision does not burden a fundamental right because it does not impinge on conduct at the core of the second amendment right, like an individual's possession of an operable handgun for the defense of hearth and home. Defendant cites no case law showing that he has a fundamental right to carry on or about his person a handgun when he is not on his own land or in his abode or fixed place of business. As discussed above, we find that *Heller* does not establish that defendant has such a right.

¶ 80     We reject, therefore, defendant's argument that the challenged provision of the AUUW statute is subject to strict scrutiny. Like the first amendment fundamental right to free speech, which is subject to different standards of scrutiny depending on the type of speech involved and the level of prohibition at issue, the second amendment right to bear arms is also subject to different standards of scrutiny. *Mimes*, 2011 IL App (1st) 082747, ¶ 71. For the reasons discussed above, the challenged provision warrants, at most, intermediate scrutiny, and we have already concluded that it satisfies intermediate scrutiny. Section 24-1.6(a)(1), (a)(3)(I) of the Criminal Code does not violate the equal protection clause, and defendant's AUUW conviction must stand.

¶ 81                                    III. CONCLUSION

¶ 82     Accordingly, we affirm one of defendant's two AUUW convictions and the sentence imposed on that conviction. We vacate his conviction for the second AUUW offense.

¶ 83     Affirmed in part and vacated in part.