*943 WILLIAMS, Circuit Judge,
dissenting.
The Supreme Court’s decisions in Heller and McDonald made clear that persons in the state of Illinois (unless otherwise disqualified) must be allowed to have handguns in their homes for self-defense. But those cases did not resolve the question in this case — whether the Second Amendment also requires a state to allow persons to carry ready-to-use firearms in public for potential self-defense. The majority opinion presents one reading of Heller and McDonald in light of the question presented here, and its reading is not unreasonable. But I think the issue presented is closer than the majority makes it out to be. Whether the Second Amendment protects a right to carry ready-to-use firearms in public for potential self-defense requires a different analysis from that conducted by the Court in Heller and McDonald. Ultimately, I would find the result here different as well and would affirm the judgments of the district courts.
Heller's approach suggests that judges are to examine the historical evidence and then make a determination as to whether the asserted right, here the right to carry ready-to-use arms in public (in places other than those permitted by the Illinois statute) for potential self-defense, is within the scope of the Second Amendment. (Heller has been criticized for reasons including that judges are not historians.) In making this historical inquiry, and in assessing whether the right was a generally recognized one, I agree with the majority that the relevant date is 1791, the date of the Second Amendment’s ratification. See Maj. Op. at 935. But I do not agree that the Supreme Court in Heller rejected the argument that the State makes here, nor do I think the State’s argument effectively asks us to repudiate Heller*s historical analysis.
The historical inquiry here is a very different one. Heller did not assess whether there was a pre-existing right to carry guns in public for self-defense. By asking us to make that assessment, the State is not asking us to reject the Court’s historical analysis in Heller; rather, it is being true to it. As I see it, the State embraces Heller*s method of analysis and asks us to conduct it for the different right that is being asserted. I am not the only one to think that Heller did not settle the historical issues. The Second Circuit’s recent unanimous decision upholding New York’s “proper cause” prerequisite to obtaining a license to carry a handgun in public recognized and discussed the different historical inquiry that occurs when the asserted right is to possess a handgun in public. See Kachalsky v. County of Westchester, 701 F.3d 81, 89-92, 94-97 (2d Cir. 2012). (Under the New York law that the Second Circuit upheld, “[a] generalized desire to carry a concealed weapon to protect one’s person and property does not constitute ‘proper cause,’ ” and “[g]ood moral character plus a simple desire to carry a weapon is not enough.” Id. at 87 (internal citations and quotations omitted)).
Heller tells us that “the Second Amendment was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors.” Heller, 554 U.S. at 599, 128 S.Ct. 2783 (internal quotations omitted). For our English ancestors a man’s home was his castle, and so he had broad powers to defend himself there. See 4 William Blackstone, Commentaries on the Laws of England 223 (1769). The focus of Heller's historical examination was on whether the Second Amendment included an individual right to bear arms or whether that right was limited to militia service. Once the Heller majority found that the Second Amendment was personal, the conclusion that one could possess ready-to-use firearms in the *944 home for self-defense there makes sense in light of the home-as-castle history.
It is less clear to me, however, that a widely understood right to carry ready-to-use arms in public for potential self-defense existed at the time of the founding. Cf. Heller, 554 U.S. at 605, 128 S.Ct. 2783 (rejecting argument by dissenters and stating, “That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties.”). In contrast to inside the home, where one could largely do what he wished, there was a long history of regulating arms in public. The 1328 Statute of Northampton, quoted by the majority on page 6, provided in relevant part that no man could “go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.” 2 Edw. Ill, c. 3 (1328). If the words of a statute are supreme, the words of the Statute of Northampton expressly prohibit going or riding while “armed,” whether at night or in the day, whether the arms are visible or hidden. And the statute contains no intent requirement. So the Statute of Northampton, by its terms, prohibited going armed in public.
This matters because the Statute of Northampton and its principles did not disappear after its enactment in 1328. The leading scholars relied upon at the time of our country’s founding also turned to the Statute of Northampton as they discussed criminal offenses. Massachusetts, North Carolina, and Virginia incorporated the Statute of Northampton in the years immediately after the Constitution’s adoption. See Patrick J. Charles, The Faces of the Second Amendment Outside the Home: Historical Versus Ahistorical Standards of Review, 60 Clev. St. L.Rev. 1, 31-32 (2012). Although the plaintiffs suggest that later generations did not view the Statute of Northampton to mean what its terms said, whether that is true is not obvious. William Blackstone, cited frequently by the Heller majority, for example, summarized the Statute of Northampton as he explained public wrongs. He wrote, “[t]he offense of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, upon pain of forfeiture of the arms, and imprisonment during the king’s pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour.” 4 Blackstone, supra, 148-49 (internal citation omitted); see also Eugene Volokh, The First and Second Amendments, 109 Colum. L.Rev. Sidebar 97, 101 (2009) (recognizing that Blackstone summarized the Statute of Northampton in this passage).
Some, like' the plaintiffs, read Blackstone to mean that the Statute of Northampton was understood to cover only those circumstances where the carrying of arms was unusual and therefore terrifying. But that seems to be a strained reading of Blackstone’s words. The more natural reading is that Blackstone states that riding or going armed with dangerous weapons is an offense and is a crime against the public peace. He then explains why the offense of riding or going armed with dangerous weapons is a crime against the public peace — because doing so makes people terrified or nervous. Notably, Blackstone compares going armed with dangerous weapons to the mere act of walking around a city in armor, which was prohibited in ancient Greece. The comparison suggests that just as seeing a person walking around a city in armor would cause other citizens to be nervous, regardless of any affirmative action, so would the reaction be to seeing another carrying dangerous weapons in a populated area.
*945 It is true as the majority states that Sir John Knight’s Case, 87 Eng. Rep. 75 (K.B. 1686), stated that the meaning of the Statute of Northampton “was to punish people who go armed to terrify the King’s subjects.” But it immediately followed that statement by saying that “[i]t is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects; and therefore this Act is but an affirmance of that law.” The case is consistent with the idea that going armed in the public arena with dangerous weapons without government permission, by its nature, terrifies the people, whether the arms can be seen or not. See Charles, supra, at 28 (examining background and implications of case and explaining that persons who were the “King’s Officers and Ministers in doing their Office” were exempt from punishment under the Statute, which explains Sir Knight’s acquittal).
Robert Gardiner’s The Compleat Constable, written for seventeenth- and eighteenth-century British constables, comports with the understanding that the Statute of Northampton’s intent was to prohibit the carrying of any weapon that might “endanger society among the concourse of the people,” Charles, supra, at 23, and that it was an affirmation of governmental police authority, as well as that “dangerous weapons” included guns, id. at 23-24. The Compleat Constable stated, with a specific reference to “guns,” that a British constable could arrest upon seeing any person ride or go armed offensively, “in Fairs or Markets or elsewhere, by Day or by Night, in affray of Her Majesties Subjects, and Breach of the Peace; or wear or carry any Daggers, Guns, or Pistols Charged.” Robert Gardiner, The Compleat Constable 18-19 (3d ed. 1707). The only exceptions were for persons serving Her Majesty, sheriffs and their officers, and those “pursuing Hue and Cry, in Case of Felony, and other Offences against the Peace.” Id. at 19.
Sir Edward Coke also discussed the Statute of Northampton, and he interpreted it to allow persons to keep weapons inside the home, explaining that a man’s home was his castle. As the majority notes, Coke also stated that one could not assemble force to go out in public. But that does not necessarily mean that persons were free to carry arms for potential personal self-defense. Indeed, in Coke’s explanation of the Statute, he recounted the case of Sir Thomas Figett, who was arrested after he “went armed under his garments, as well as in the palace, as before the justice of the kings bench.” Edward Coke, Institutes of the Laws of England 161-62 (1797). In his defense, Figett said there “had been debate” between him and another earlier in the week, “and therefore for doubt of danger, and safeguard of his life, he went so armed.” Id. at 162. Nonetheless, he was ordered to forfeit his arms and suffer imprisonment at the king’s pleasure. Id.
I also note that in examining the contours of the proposed right, the majority looks to the perspective of an Ohio frontiersman. But it seems that when evaluating the rights originally embodied in the Second Amendment, looking to the margins should not be the inquiry. Cf. Heller, 554 U.S. at 605, 128 S.Ct. 2783. We have already observed that there were a number of laws in our country around the time of the founding that limited the discharge of firearms in public cities. See Ezell v. City of Chicago, 651 F.3d 684, 705 (7th Cir.2011) (“The City points to a number of founding-era, antebellum, and Reconstruction state and local laws that limited discharge of firearms in urban environments.”); id. at 705-06 & nn. 13-14; id. at 713-14 (Rovner, J., concurring) (observing that “none of the 18th and 19th century jurisdictions cited by the City ... were apparently concerned that banning or limiting the discharge of firearms with *946 in city limits would seriously impinge the rights of gun owners” and that some of the early laws’ concern with fire suppression reflected that “public safety was a paramount value to our ancestors” that sometimes trumped a right to discharge a firearm in a particular place). So while there are a variety of other sources and authorities, the ones I have discussed suggest that there was not a clear historical consensus that persons could carry guns in public for self-defense. See also Kachalsky, 701 F.Sd at 91 (stating that unlike the ban on handguns in the home at issue in Heller, “[hjistory and tradition do not speak with one voice” regarding scope of right to bear arms in public and that “[w]hat history demonstrates is that states often disagreed as to the scope of the right to bear arms [in public]”).
I will pause here to state that I am not convinced that the implication of the Heller and McDonald decisions is that the Second Amendment right to have ready-to-use firearms for potential self-defense extends beyond the home. That the Second Amendment speaks of the “right of the people to keep and bear arms” (emphasis added) does not to me imply a right to carry a loaded gun outside the home. Heller itself demonstrates this. The Court interpreted “bear” to mean to “carry” or to “wear, bear, or carry,” upon one’s person, for the purpose of being armed and ready in case of conflict. Heller, 554 U.S. at 584, 128 S.Ct. 2783. And we know that Heller contemplated that a gun might only be carried in the home because it ordered the District of Columbia to permit Heller to do precisely that: it directed that unless Heller was otherwise disqualified, the District must allow him “to register his handgun and must issue him a license to carry it in the home.” Id. at 635, 128 S.Ct. 2783 (emphasis added). Mr. Heller did not want simply “to keep” a gun in his closet. He wanted to be able “to bear” it in case of self-defense, and the Supreme Court said he could.
We have warned against “treating] Heller as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense____ Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.” See United States v. Skoien, 614 F.3d 638, 640 (7th Cir.2010) (en banc). The Supreme Court made clear in Heller and McDonald that its holdings only applied to handguns in the home for self-defense. See, e.g., id.; Heller, 554 U.S. at 635, 128 S.Ct. 2783 (“And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.”). The Court’s language must be read in that light. The plaintiffs point, for example, to Heller’s statement that the operative clause of the Second Amendment guarantees “the individual right to possess and carry weapons in case of confrontation.” 554 U.S. at 592, 128 S.Ct. 2783. But Heller makes this statement in the portion of its opinion supporting the conclusion that the Second Amendment included a personal right, as compared to one solely related to the militia. See id. at 592-95, 128 S.Ct. 2783. The plaintiffs also point out that Heller stated that the need for self-defense is “most acute” in the home, which they argue implies that there is a Second Amendment right to possess ready-to-use firearms in places outside the home. See id. at 628, 128 S.Ct. 2783. But the Court made this comment in the context of its conclusion that the District of Columbia handgun ban applied in the home; the fact that the need was acute in the home emphasized that the fatal flaw in the handgun ban was *947 that it applied in the home. See id. at 628-30, 128 S.Ct. 2783.
By all this I do not mean to suggest that historical evidence definitively demonstrates there was not a right to carry arms in public for self-defense at the time of the founding. The plaintiffs point to other authorities that they maintain reveal the opposite. At best, the history might be ambiguous as to whether there is a right to carry loaded firearms for potential self-defense outside the home. But if that is the case, then it does not seem there was “a venerable, widely understood” right to do so. That may well mean that the right the plaintiffs seek here is outside the scope of the Second Amendment. Perhaps under Heller s rationale that the Second Amendment codified a preexisting right, with history not seeming to clearly support a generally recognized right, the analysis ends right here.
We said in Ezell that “if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected — then there must be a second inquiry into the strength of the government’s justification for restricting or regulating the exercise of Second Amendment rights.” 651 F.3d at 703. In doing so, we stated that “the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law’s burden on the right.” Id. Any right to carry firearms in public for potential self-defense, if there is one, is not at the “core” of the Second Amendment. See Kachalsky, 701 F.3d at 93; United States v. Marzzarella, 614 F.3d 85, 92 (3d Cir.2010).
The Supreme Court made clear in Heller that “nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings....” 554 U.S. at 626, 128 S.Ct. 2783. McDonald made sure to “repeat those assurances.” McDonald, 130 S.Ct. at 3047. That a legislature can forbid the carrying of firearms in schools and government buildings means that any right to possess a gun for self-defense outside the home is not absolute, and it is not absolute by the Supreme Court’s own terms.
Indeed, the Supreme Court would deem it presumptively permissible to outright forbid the carrying of firearms in certain public places, but that does not mean that a self-defense need never arises in those places. The teacher being stalked by her ex-husband is susceptible at work, and in her school parking lot, and on the school playground, to someone intent on harming her. So why would the Supreme Court reassure us that a legislature can ban guns in certain places? It must be out of a common-sense recognition of the risks that arise when guns are around.
Any right to carry loaded firearms outside the home for self-defense is, under Heller’s own terms, susceptible to a legislative determination that firearms should not be allowed in certain public places. The Supreme Court tells us that a state can forbid guns in schools. That probably means it can forbid guns not just inside the school building, but also in the playground and parking lot and grassy area on its property too. And if a state can ban guns on school property, perhaps it can ban them within a certain distance of a school too. Cf. 18 U.S.C. § 922(q)(2)(A). The Supreme Court also tells us that a state can ban guns in government buildings. The list of such buildings would seem to include post offices, courthouses, libraries, Department of Motor Vehicle facilities, city halls, and more. And the legislature can ban firearms in other “sensitive places” too. So maybe in a place of worship. See GeorgiaCarry.Org v. Geor *948 gia, 687 F.3d 1244 (11th Cir.2012) (upholding ban on firearms in places of worship). Maybe too on the grounds of a public university. See DiGiacinto v. Rector & Visitors of George Mason Univ., 281 Va. 127, 704 S.E.2d 365 (2011) (upholding regulation prohibiting possession of guns in university facilities and at campus events). Or in an airport, or near a polling place, or in a bar. And if the latter is true then perhaps a legislature could ban loaded firearms' any place where alcohol is sold, so in restaurants and convenience stores as well. The resulting patchwork of places where loadéd guns could and could not be carried is not only odd but also could not guarantee meaningful self-defense, which suggests that the constitutional right to carry ready-to-use firearms in public for self-defense may well not exist.
It is difficult to make sense of what Heller means for carrying guns in public for another notable reason. Immediately before the sentence giving a presumption of lawfulness to . bans on guns for felons and the like, Heller states: “Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.” 554 U.S. at 626, 128 S.Ct. 2783 (emphasis added and internal citations omitted). The implication of the Supreme Court’s statement would seem to be that concealed carry is not within the scope of the Second Amendment (or at the least that that is the presumption). See, e.g., Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L.Rev. 1343, 1359 (2009) (“This appears to be an endorsement of yet another exception to the constitutional right.”); Hightower v. City of Boston, 693 F.3d 61, 73 (1st Cir.2012) (interpreting this language to mean that laws prohibiting the carrying of concealed weapons are an example of presumptively lawful restrictions); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1523-24 (2009). That would not be the first time the Supreme Court had made such a statement. See Robertson v. Baldwin, 165 U.S. 275, 281-82, 17 S.Ct. 326, 41 L.Ed. 715 (1897) (stating in dicta that Second Amendment right “is not infringed by laws prohibiting the carrying of concealed weapons”).
If carrying concealed weapons is outside the scope of the Second Amendment, the consequence would be significant. “ ‘In the nineteenth century, concealed carry was often considered outside the scope of the right to bear arms. Today, it is the most common way in which people exercise their right to bear arms.’ ” Joseph Blocher, The Right Not to Keep or Bear Arms, 64 Stan. L.Rev. 1, 45 (2012) (quoting David B. Kopel, The Right to Arms in the. Living Constitution, 2010 Cardozo L.Rev. 99, 136 (2010)). And, as the Moore plaintiffs acknowledge in their brief, “today, openly carrying handguns may alarm individuals unaccustomed to firearms.” The implication, as explained by Nelson Lund (author of the Second Amendment Foundation’s amicus curiae brief in Heller in support of Mr. Heller): “In some American jurisdictions today, for example, openly carrying a firearm might plausibly be thought to violate the ancient common law prohibition against ‘terrifying the good people of the land’ by going about with dangerous and unusual weapons. If courts were to conclude that open carry violates this common law prohibition (and thus is not within the preexisting right protected *949 by the Second Amendment), after Heller has decreed that bans on concealed carry are per se valid, the constitutional right to bear arms would effectively cease to exist.” Lund, supra, at 1361-62. (To be clear, if there is a Second Amendment right to carry arms outside the home for potential self-defense in Illinois as my colleagues have found, I am not suggesting that Illinois should not implement concealed carry laws.)
If there is any right to carry ready-to-use firearms among the public for potential self-defense, the plaintiffs contend the Illinois statutes must be unconstitutional because their ban is far-reaching. But I see the question as somewhat more nuanced. Protecting the safety of its citizens is unquestionably a significant state interest. United States v. Salerno, 481 U.S. 739, 748, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); Kelley v. Johnson, 425 U.S. 238, 247, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). Illinois chose to enact the statutes here out of concern for the safety of its citizens. See People v. Marin, 342 Ill.App.3d 716, 277 Ill.Dec. 285, 795 N.E.2d 953, 959-62 (2003).
Given the State’s obvious interest in regulating the safety of its citizens, the question is who determines the contours of any right to carry ready-to-use firearms for self-defense in public when they are unsettled as a matter of both original history and policy. The Heller majority concluded that “enshrinemept of constitutional rights necessarily takes certain policy choices off the table ... including] the absolute prohibition of handguns held and used for self-defense in the home.” 554 U.S. at 636, 128 S.Ct. 2783. But “as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.” United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir.2011).
The Supreme Court has told us that we must “accord substantial deference to the predictive judgments of [the legislature].” Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). “In the context of firearm regulation, the legislature is ‘far better equipped than the judiciary’ to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.” Kachalsky, 701 F.3d at 97. The legislature knows the statistics and is in a far better position than we are to weigh their import. Illinois reasonably wants to try to reduce the incidence of death and injury by firearms, both those which come from affirmative acts of violence and also the many deaths and injuries that occur accidentally, and doing so by taking them off the streets is a legislative judgment substantially related to its important governmental objective of reducing injury and death by firearms.[1]
It is common sense, as the majority recognizes, that a gun is dangerous to more people when carried outside the home. See Maj. Op. at 937. When firearms are carried outside of the home, the safety of a broader range of citizens is at issue. The risk of being injured or killed now extends to strangers, law enforcement personnel, and other private citizens who happen to be in the area. Cf. David lie *950 menway & Deborah Azrael, The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey, 15 Violence & Victims 257, 271 (2000) (finding that guns are used “far more often to kill and wound innocent victims than to kill and wound criminals”). Indeed, the Illinois legislature was not just concerned with “crime rates” and “murder rates” when it passed the law. Cf Maj. Op. at 937. It also sought to “prevent situations where no criminal intent existed, but criminal conduct resulted despite the lack of intent, e.g., accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or ... the danger of a police officer stopping a car with a loaded weapon on the passenger seat.” See Marin, 277 Ill.Dec. 285, 795 N.E.2d at 962. The danger of such situations increases if guns may be carried outside the home.
That the percentage of reported accidental gun-related deaths is lower as compared to suicide (which accounts for the majority of firearms-related deaths) and murder, see Robert A. Hahn et al., Firearms Laws and the Reduction of Violence: A Systematic Review, 28 Am. J. Preventive Med. 40, 40 (2005), does not make the Illinois law invalid. First, in those statistics, “[ujnintentional firearm-related deaths appear to be substantially under-counted (i.e., misclassified as due to another cause),” id. at 47, and in any event the State has a significant interest in reducing the risk of accidental firearms-related deaths as well as accidental injuries. The majority says the law cannot be justified on the ground that it reduces the accidental death rate unless it could be shown that allowing guns to be carried in public causes gun ownership to increase. See Maj. Op. at 939. But whether gun ownership increases is not the question. See id. at 938. It is not the number of guns owned that matters but where the guns are carried. Illinois already allows people to own and have guns in their homes; however, they cannot carry them in public. The Illinois legislature reasonably concluded that if people are allowed to carry guns in public, the number of guns carried in public will increase, and the risk of firearms-related injury or death in public will increase as well. Cf. Marin, 277 Ill.Dec. 285, 795 N.E.2d at 959-62.
And it is also common sense that the danger is a great one; firearms are lethal. Cf. Skoien, 614 F.3d at 642 (“guns are about five times more deadly than knives, given that an attack with some kind of weapon has occurred”) (citing Franklin E. Zimring, Firearms, Violence, and the Potential Impact of Firearms Control, 32 J.L. Med. & Ethics 34 (2004)). For that reason too the focus simply on crime rates misses the mark. As Philip J. Cook, a Duke University professor cited twice by the majority, put it: “My research over 35 years demonstrates that the effect of gun availability is not to increase the crime rate but to intensify the crime that exists and convert assaults into murders.” Ethan Bronner, Other States, and Other Times, Would Have Posed Obstacles for Gunman, N.Y. Times, July 25, 2012, at A12.
The majority’s response to the fact that guns are a potential lethal danger to more people when carried in public seems to be to say that knowing potential victims could be armed may have a deterrent effect or make criminals timid. See Maj. Op. at 937, 939. Yet even an article relied upon by the majority cautions that the effect on criminals may well be more gun use: “Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If *951 increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.” Philip J. Cook, Jens Ludwig & Adam M. Samaha, Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective, 56 UCLA L.Rev. 1041,1081 (2009).
On the other side of the lethal danger to the State’s citizens is the asserted interest in carrying guns for self-defense, yet even the majority does not contend that carrying guns in public has been shown to be an effective form of self-defense. For example, as the majority acknowledges, University of Pennsylvania researchers found that assault victims are more likely to be armed than the rest of the population. See Maj. Op. at 938-39 (citing Charles C. Branas et al., Investigating the Link Between Gun Possession and Gun Assault, 99 Am. J. of Pub. Health 2034, 2037 (2009)). The researchers examined shootings in Philadelphia and concluded that “gun possession by urban adults was associated with a significantly increased risk of being shot in an assault,” id., which suggests, if anything, that carrying a gun is not effective self-defense. The researchers posited that possible reasons for their findings included that a gun may falsely empower its possessor to overreact, that persons with guns may increase the risk of harm by entering dangerous environments that they normally would have avoided, and that persons bringing guns to an otherwise gun-free conflict may have those guns wrested away and turned on them. Id. at 2037-38.
Other studies have found that in states with broad concealed-carry laws there is an increased chance that one will be a victim of violent crime. Yale Law School Professors Ian Ayres and John J. Donohue III concluded that “the evidence is most supportive of the claim that [right-to-carry] laws increase aggravated assault.” More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006, 6 Econ. J. Watch 218, 220 (May 2009).[2] (Donohue is now at Stanford.) Similarly, another study showed that “an increase in gun prevalence causes an intensification of criminal violence — a shift toward a greater lethality, and hence greater harm to a community.” Philip J. Cook & Jens Ludwig, The Social Costs of Gun Ownership, 90 J. Pub. Econ. 379, 387 (2006). Other researchers have concluded that guns are “used far more often to intimidate and threaten than they are used to thwart crimes.” Hemenway & Azrael, supra, at 271.
The ban on firearms in public is also an important mechanism for law enforcement to protect the public. With guns banned in public an officer with reasonable suspicion to stop and frisk a person can, upon finding a gun, take the gun off the street *952 before a shooting occurs. The majority says that a state may be able to require “open carry,” where persons who carry guns in public must carry them in plain view. Maj. Op. at 938. Living with the open carrying of loaded guns on the streets of Chicago and elsewhere would certainly be a big change to the daily lives of Illinois citizens. Even the plaintiffs do not seem to want Illinois to take that drastic a step, recognizing that “openly carrying handguns may alarm individuals unaccustomed to firearms” and that Heller “does not force states to allow the carrying of handguns in a manner that may cause needless public alarm.” Moore Br. at 35.
The majority also suggests that with open carry the police could still arrest persons who carry concealed guns. This is true but seems contradictory to its statement two sentences earlier that in its view, under the current law police will often lack reason able suspicion to stop a person with a concealed gun since it is concealed. See Maj. Op. at 938. To the latter, guns are not allowed now, so theoretically persons are attempting to conceal them. Nonetheless, Chicago’s Police Department made over 4,000 arrests on weapons violations in 2009, though some of these arrests could have been made in conjunction with other crimes as well.[3] More importantly, “concealed” does not mean “invisible.” An officer who reasonably suspects he sees a gun in a car when he pulls someone over, or notices what he reasonably suspects to be a gun bulging out of someone’s clothes, can under the law as it currently stands arrest that person and take the gun off the street.
Allowing open (or concealed) carry does not address the fundamental point about law enforcement’s ability to protect the public: if guns are not generally legal to have in public, officers can remove them from the streets before a shooting occurs whenever they come across a gun. Under a law like the Illinois law, an officer with some reasonable belief that a person is carrying a firearm can stop that person and remove the gun from the street because the officer has a reasonable belief that a crime is taking place. The ability to use stops and arrests upon reasonably suspecting a gun as a law enforcement tactic to ultimately protect more citizens does not work if guns can be freely carried.
To the extent the majority opinion’s studies draw different conclusions, the Supreme Court has made clear that “the possibility of drawing two inconsistent conclusions from the evidence” does not prevent a finding from being supported by substantial evidence. Turner Broad., 520 U.S. at 211, 117 S.Ct. 1174; see also Kachalsky, 701 F.3d at 98-99 (recognizing different studies concerning relationship between handgun access and violent crime, and handgun access and safety and character of public places, and stating, “It is the legislature’s job, not ours, to weigh conflicting evidence and make policy judgments.”). Moreover, it is not necessary for “the statute’s benefits” to be “first established by admissible evidence” or by “proof, satisfactory to a court.” Skoien, 614 F.3d at 641. Nor would the State need to make a stronger showing here than in Skoien. Skoien concerned the prohibition on firearm possession by misdemeanants with domestic violence convictions, a ban that also applies to the core Second Amendment right of gun possession in the home. As such, the “strong showing” the government acknowledged it needed to demonstrate there made sense. See id.
*953 I would note too that the 2005 paper “Firearms Laws and the Reduction of Violence: A Systematic Review,” quoted by the majority for its statement that based on its review, evidence was insufficient to determine whether the degree of firearms regulation is associated with decreased or increased violence, Maj. Op. at 937-38, did not limit that conclusion to the degree of firearms regulation. The paper found the evidence available from identified studies “insufficient to determine” the effectiveness of any of the laws it reviewed, even including acquisition restrictions (e.g., felony convictions and personal histories including persons adjudicated as “mental defective”), and firearms registration and licensing — propositions that even the plaintiffs seem to favor. And, the paper cautioned that “[a] finding that evidence is insufficient to determine effectiveness means that we do not yet know what effect, if any, the law has on an outcome— not that the law has no effect on the outcome.” Hahn et ah, supra, at 40.
The Illinois statutes safeguard the core right to bear arms for self-defense in the home, as well as the carry of ready-to-use firearms on other private property when permitted by the owner, along with the corollary right to transport weapons from place to place. See 720 Ill. Comp. Stat. 5/24-2; 720 Ill. Comp. Stat. 5/24-1.6(a)(1). Guns in public expose all nearby to risk, and the risk of accidental discharge or bad aim has lethal consequences. Allowing public carry of ready-to-use guns means that risk is borne by all in Illinois, including the vast majority of its citizens who choose not to have guns. The State of Illinois has a significant interest in maintaining the safety of its citizens and police officers. The legislature acted within its authority when it concluded that its interest in reducing gun-related deaths and injuries would not be as effectively served through a licensing system. For one, every criminal was once a law-abiding citizen, so strategies for preventing gun violence that bar prior criminals from having firearms do not do enough. See Philip J. Cook, et al., Criminal Records of Homicide Offenders, 294 J. Am. Med. Ass’n 598, 600 (2005) (homicide prevention strategies targeted toward prior offenders “leave a large portion of the problem untouched”). Nor could the State ensure that guns in public are discharged only, accurately, and reasonably in instances of self-defense. See People v. Mimes, 352 Ill.Dec. 119, 953 N.E.2d 55, 77 (Ill.App.Ct.2011) (“The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force.”).
The Supreme Court has “long recognized the role of the States as laboratories for devising solutions to difficult legal problems,” and courts “should not diminish that role absent impelling reason to do so.” Oregon v. Ice, 555 U.S. 160, 171, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009). Indeed, “[i]t is one of the happy incidents of the federal system that a single .courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.” New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandéis, J., dissenting). (And to the extent it matters, Illinois is not the only place that has and enforces strict gun laws. New York City, for example, has gun laws that are in effect like those of Illinois; while technically a “may issue” location where the city may issue permits for handgun carry outside the home, New York City rarely does so and so has been characterized as maintaining a virtual ban on handguns. See Lawrence Rosenthal, Second Amendment Plumbing after Heller: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and *954 Criminal Street Gangs, 41 Urb. Lawyer 1, 39 (2009)). Reasonable people can differ on how guns should be regulated. Illinois has chosen to prohibit most forms of public carry of ready-to-use guns. It reaffirmed that just last year, when its legislature considered and rejected a measure to permit persons to carry concealed weapons in Illinois. See Dave McKinney, Concealed-Carry Measure: Shot Down in Springfield, Chicago Sun-Times, 2011 WLNR 9215695 (May 6, 2011). In the absence of clearer indication that the Second Amendment codified a generally recognized right to carry arms in public for self-defense, I would leave this judgment in the hands of the State of Illinois.

. State courts that have addressed a state constitutional right to bear arms have used a "reasonable regulation” standard, a test that is more deferential than intermediate scrutiny but that, unlike the interest-balancing test proposed in Justice Breyer’s Heller dissent, does not permit states to prohibit all firearm ownership. See, e.g., State v. Hamdan, 264 Wis.2d 433, 665 N.W.2d 785, 798-801 (2003); Adam Winkler, Scrutinizing the Second Amendment, 105 Mich. L.Rev. 683, 686-87 (2007) (discussing "hundreds” of state court opinions using this test).

. The majority cites Moody and Marvell’s 2008 paper suggesting that Ayres and Donohue should have extended their 2003 analysis by one more year. But extending their data is just what Ayres and Donohue did in their May 2009 piece, More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006. And after extending their state panel data by six additional years, they again concluded that “the best evidence to date suggests that [right-to-carry] laws at the very least increase aggravated assault.” Id. at 231. They also thoroughly responded to Moody and Marvell's criticism that their initial 2003 analysis evaluated the trend for five years rather than six, explaining in part: “We would have thought, though, that one would want to be very cautious in evaluating trends beyond five years when 14 of the 24 states have no post-passage data beyond three years.” Id. at 218-19. They also criticized Moody and Marvell's conclusions and demonstrated that the two had incorrectly graphed the estimates from Donohue’s table and misinterpreted the estimates. Id. at 219.

. Chicago Police Dep’t Annual Report 2010, at 34, available at https://portal.chicagopolice. org/portal/page/portal/ClearPath/News/ Statistical 20Reports/Annual% 20Re-ports/lOAR.pdf.